MARION BURTON ET AL. v. WABASH RAILWAY COMPANY, Appellant.—
58 S. W. (2d) 443.

Division Two, March 3, 1933.

*Homer Hall* and *Collet & Son* for appellant.

*Roy McKittrick* for respondents.

FITZSIMMONS, C.—This case comes to us from the Kansas City Court of Appeals under Section 6 of the Constitutional Amendment of 1884, the Kansas City Court of Appeals having deemed its opinion herein (reported in 22 S. W. (2d) 201) to be contrary to the opinion of the Springfield Court of Appeals in the case of Carr v. St. Louis-San Francisco Railway Company (Mo. App.), 284 S. W. 184.

Respondents Burton et al., sued appellant Railway Company in the Circuit Court of Chariton County for damages on account of delay in the transportation of two carloads of cattle from Clifton Hill, Randolph County, Missouri, to the National Stock Yards at East St. Louis, Illinois. Respondents concede that appellant, within a reasonable time, transported the cattle to a dock or landing platform in the National Stock Yards and that there the cattle were promptly unloaded through chutes into receiving or unloading pens. One carload of the stock was transferred in time for the market on the day of arrival from the receiving pens to the sales pens of the consignee, the Creson Commission Company, in the same stock yards.

But the other carload was not so transferred until nearly noontime. In the interval the market had declined. The cattle in the first carload were not sold when received by the commission firm on account of the non-arrival of the second carload in the sales pens. The cattle were sold in Chicago five days later. Respondents sued for damages arising out of a fall in prices, extra shrinkage in weight of the cattle and extra feed.

The case was tried before the court, a jury having been waived. There was judgment for respondents in the sum of $180.18 on account of the delayed transfer to the sales pens of the second carload. Instructions given and refused disclose that the trial court adopted respondents' theory that appellant did not complete its contract of shipment until the cattle were delivered to the sales pens of the consignee, and therefore that appellant was liable for any delay in the transfer from the unloading pens. The court rejected appellant's theory that no duty devolved upon it in the handling or movement of the cattle after they were transferred from the cars to the unloading pens. The judgment of the trial court was in accord with the decision of the Springfield Court of Appeals in Carr v. Railway Company, supra, which decision was then in the published reports. The Kansas City Court of Appeals by its opinion in the instant case (22 S. W. (2d) 201) accepted appellant's theory of the time and manner of the termination of the contract of shipment. Hence the conflict and certification of the appeal to this court.

The contract between respondents and appellant was drawn upon the form of the Uniform Live Stock Contract, prescribed by the Interstate Commerce Commission. By it appellant agreed to carry the live stock described in the contract to appellant's "usual place of delivery at said destination, if on its road or its own water line, otherwise to deliver to another carrier on the route to said destination." We find that the Kansas City Court of Appeals in its opinion has made a fair statement subject to some qualifications, of the facts in evidence concerning the method of handling live stock at the stock yards. We therefore adopt substantial parts of the statements as follows:

"The method by which live stock is handled by the National Stock Yards Company, who own and control the stock yards in East St. Louis, is as follows: When the cattle arrive at the yards the train is set at the dock for unloading and a crew of men in the employ of the stock yards company open the doors to the cars and drive the cattle into the unloading pens. These pens, after the cattle are placed therein are locked. On the arrival of a train of live stock the way-bills accompanying shipments are posted in a conspicuous place in the receiving office of the stock yards company, showing the arrival of the car, and as soon as the stock is unloaded a note is made of the hour of the unloading upon the waybills. The waybills or notices are thus posted for the purpose of giving the notice they contain to the

commission companies. These waybills or notices are available to all commission companies and constitute notice to them of the arrival of live stock consigned to them. The commission company to which stock in the shipment is consigned may come to the unloading pens and obtain the stock, if it so desires. However, it is necessary for the key man, who is an employee of the stock yards company having charge of the keys to the unloading pens, to unlock the particular pen before the commission company can get possession of the stock.

"However, it is not the custom of the commission companies to receive stock at the unloading pens, although they occasionally do, but it is customary for the stockyards company to drive the cattle to the pens consigned to the particular commission company where they are taken possession of by that company. The stock yards company always performs this service unless the commission company calls for the stock at the unloading pens.

"The commission companies do not own any pens in the stock yards but so-called sales pens are assigned to them by the stock yards company for which the commission companies pay no specific rental, but for the exclusive use thereof the stock yards company charges the commission companies thirty-five cents for each head of cattle yarded for them. The charge is always passed on to the shipper by the commission companies. This charge of thirty-five cents for each head of cattle yarded covers all other services of the stock yards company, including the locking and unlocking of the sales pens before and after sales hours, and the delivery of the stock, when sold by the commission companies from the scales, the live stock being driven from the sales pens to the scales by the servants of the commission companies. There was testimony on the part of the plaintiffs that the charge of thirty-five cents per head covers everything the stock yards company does relative to the cattle, except furnishing feed, while they are in the possession of the commission companies after the stock arrives in the latter's pens. There was other testimony that the thirty-five cent charge covered the driving of the cattle from the unloading chutes to the sales pens.

"The evidence shows that the sales pens are connected with the unloading chutes by gates and alleys, and in this instance the sales pens of the Creson Commission Company were but 400 yards from the pens into which the cattle in question were unloaded.

"The carrier pays the stock yards company $1 per car for the unloading and placing of the live stock in the unloading pens. Whether this also covers the service of the stock yards company in driving the stock from the unloading pens to the sales pens of the commission companies has never been determined, according to plaintiff's evidence. According to defendant's testimony it does not cover these services but such services are taken care of by the thirty-five cents charged by the stock yards company on each head of cattle yarded. The evidence shows that it was necessary for the stock yards

company to keep the cattle moving from the unloading chutes so that the contents of other live stock trains arriving at the stock yards could be unloaded into them.

"The commission companies have the same opportunity to get cattle out of the unloading pens that they have to move the cattle from their sales pens after sales hours. In each instance they call for the key man who unlocks the pen and allows the commission men to remove the cattle."

The statement of the Kansas City Court of Appeals should be qualified and supplemented in the following particulars:

(1) Concerning what the yardage charge of thirty-five cents per head covers Mr. Ira. C. Creson, the consignee of the cattle testifying on behalf of plaintiff, said: "Q. The yardage charge covers all service rendered by the Stock Yards Company to you or your customers? A. No, they deliver these cattle to the pens and we take charge of the cattle. Q. Do you pay them extra for that? A. No. Q. That is what I am talking about. A. Oh. Q. The yardage pays for everything they do for you? A. Oh, yes."

Mr. Fred Lyner, a commission man at the stock yards and a witness for plaintiff testified on cross-examination as to what the yardage charge covers as follows: "Q. But your understanding is that the charges which they make to you and that you collect from your customer and pay them, includes everything they do for handling stock in the yards and all facilities they furnish? A. Yes."

(2) Touching the dominion of the cattle after they are unloaded Mr. E. F. Bisbee, vice president of the Stock Yards Company testified: "Q. Mr. Bisbee, I want to see if I clearly understand what you state about the dominion that the commission man has over the cattle from the time unloaded into the chutes. Did you say it was the same as the character of dominion which he has in regard to the holdovers in his pens? A. Yes."

(3) The record also shows that the custom of the stock yards company narrated by the Court of Appeals with respect to the posting in a conspicuous place of the waybills accompanying shipments as notice to the commission companies of the arrival of the live stock consigned to them was observed with respect to the two carloads of cattle which are the subject-matter of this action.

I. The shipment in suit was interstate and therefore the question of performance of the contract is to be determined bv Federal decisions and statutes. [Burgher v. Wabash Railway Co. (Mo. App.), 217 S. W. 853; Baker v. Schaff (Mo. App.). 211 S. W. 103; Texas & Pacific Railway Co. v. Abilene Cotton Oil Company, 204 U. S. 426.]

II. We are of opinion that we should dispose of this appeal in harmony with the decision of the Kansas City Court of Appeals

that "the carrier in this instance discharged every duty it owed the plaintiffs when it delivered, through the stock yards company, the cattle in question into the unloading pens at a place where" they could be conveniently procured by the consignee and when the stock yards company promptly notified the consignee by posting the way-bills of the arrival of the cattle in unloading pens.

Mr. Justice Van Devanter, while he was a United States Circuit Judge, described the sheds and pens of a stock yards company as the depot of railroad companies for the delivery and the receipt of shipments of live stock. [Union Stock Yards Company v. United States, 169 Fed. 404, 1. c. 406.] In the case of Atchison, Topeka and Santa Fe Railway Company v. Interstate Commerce Commission, 188 Fed. 229, 1. c. 237 (1911), which was a suit in equity in the United States Commerce Court to restrain the enforcement of an order of the defendant, the court ruled: "In the absence of special contract or usage to the contrary, under the common law carriers by land are bound to deliver or tender goods to the consignee at his residence or place of business, and until this is done they are not relieved from responsibility as carriers. This rule, however, never was applied to railroads. They are exempt from the duty of personal delivery, and are bound only to carry the goods to the depot or station to which they are destined and there hold or place them in a warehouse ready for delivery whenever the consignee or owner calls for them, after notifying the consignee or owner of their readiness to deliver." (Authorities cited.) And the duty of carriers with respect to live stock is analogous to their duty in the handling of inanimate freight. [10 C. J. 79.] In the instant case, appellant by its contract agreed to carry respondent's live stock to "its (appellant's) usual place of delivery at said destination." And under the facts and the applicable law, the usual place of delivery was the unloading pens at the stock yards.

Prior to the decision of the United States Supreme Court in 1912 in the case of United States at the request of the Interstate Commerce Commission v. Union Stock Yard & Transit Company, 226 U. S. 286, stock yards companies charged for their services as they pleased and discriminated as they saw fit. But in that case the Supreme Court affirmed the decree in favor of the government rendered by the court below, and held that a stock yards company was subject to the Interstate Commerce Act (U. S. Code Annotated, Title 49, Secs. 1 to 15a), and therefore under the restriction of the Elkins Act U. S. Code Annotated, Title 49, Secs. 41-43), as to departures from their published rates.

In the case of Adams v. Mills, Director General of Railroads and the Union Stock Yard & Transit Company, 286 U. S. 397, 76 L. Ed. 1184, the United States Supreme Court held that the defendants were liable to the plaintiffs, 103 live stock commission merchants doing busi-

ness at the stock yards in Chicago, for an unlawful charge of twenty-five cents per car which the stock yard company exacted from commission men and shippers for unloading live stock during the period of Federal control of railroads. In this case the court held that "whether unloading at terminal stock yards is a part of the transportation of livestock is not a pure question of law to be determined by merely reading the tariffs, but depends upon the determination of certain facts, including the history of the stock yards in their relation to the line-haul carriers, the history of the unloading charge at the yards, and the action of the parties in relation thereto."

██ Under the facts of that case it was found that the unloading at the Chicago Stock Yards was a part of the transportation of live stock. And under the facts in the instant case the discharge of respondents' cattle from the cars into the unloading pens at the National Stock Yards in East St. Louis was not only a part of the transportation but it was the last act of fulfillment by appellant of its contract of carriage.

In accordance with the provision of the Interstate Commerce Act, as applied to stock yards in United States v. Union Stock Yards & Transit Company, supra, and with the provisions of the Packers and Stock Yards Act, the National Stock Yards Company made and published its schedule of charges which was in effect at the time of the shipment in question, and which was received in evidence in this case.

Item Ten of the stock yards schedule reads: "Carloading and unloading live stock, $1.00 per car." The scope of the service contemplated by this item is obvious. Since unloading was part of the transportation, as we have seen, this charge could not lawfully be made by the stock yards company against respondents, under the authority of Adams v. Mills, supra. It could only be made against the carrier. Item One of the schedule tabulates the yardage charges for the several kinds of live stock, including cattle at thirty-five cents a head. It is not disputed that this is a charge to be made solely against shippers or their consignees; that the Creson Commission Company, the consignee, paid this charge to the stock yards company on respondents' two carloads, and that this was the only charge except perhaps feed bills that the Creson Company paid to the stock yards company for the account of respondents. And the only inference to be drawn from the evidence is that this charge of thirty-five cents per head covered all services rendered by the stock yards company to the commission company with respect to respondents' cattle beginning with the transfer of them from the unloading pens to the sales pens. The service of driving the cattle from the one set of pens to the other was analogous to the services of a freighter, hired by a consignee to haul merchandise to his door from the warehouse where the common carrier had completed its contract of transportation.

276

■ The Packers and Stock Yards Act, approved August 15, 1921, (U. S. Code Annotated, Title 7, Agriculture), restated and enlarged the duty of a stock yard owner to "print and keep open to public inspection at the stockyard, schedules showing all rates and charges for the stockyard services furnished," etc., subject to the approval of the Secretary of Agriculture. The same act defined the scope of the services which the National Stock Yards Company might render. (Section 201(b) of the Packers and Stockyards Act (U. S. Code Annotated, Title 7), is as follows): "The term 'stockyard services' means services or facilities furnished at a stockyard in connection with the receiving, buying or selling on a commission basis or otherwise, marketing, feeding, watering, holding, delivery, shipment, weighing or handling in commerce, of livestock."

The schedule of charges having been made by command of the Federal law and having received its sanction from the Secretary of Agriculture was not a mere private price list of the stock yards company. The beneficiaries of the services to be rendered by the stock yards company were by law definitely fixed or ascertainable. The line of demarcation where service to the carrier ends and service to the shipper or consignee begins is exactly determinable. There is no overlapping of zones of service to carrier and shipper and no form of service that may be rendered by the stock yards company that is not contemplated by law or is not covered by the schedule of charges. It is not reasonable to believe, if, under Federal law, it was the duty of appellant to deliver the cattle to consignee by driving them into its sales pens that the carrier under the schedules and the law would escape liability for that final service or that the consignee could be burdened with the charge for it.

In the instant case the stock yards company rendered to the Creson Commission Company most, if not all, of the kinds of services mentioned in Section 201, supra. The record clearly discloses that the cattle were consigned to the Creson Commission Company for sale by that company as the agent of respondents. The transportation contract shows that respondents did not pay the freight charges in advance. Therefore by the terms of the contract the Creson Company, as consignee, was bound to pay these charges upon delivery. [New York C. & H. R. Railroad Co. v. York and W. Co., 256 U. S. 406-408, 65 L. Ed. 1016-1020, 41 Sup. Ct. 509.] We may safely assume therefore that the Creson Company paid the freight charges. It is the practice of carriers to absorb the stock yards unloading charge in the freight bill. ■ [Adams v. Mills, supra.] Therefore when the Creson Company as the agent of respondents paid the freight bill it paid as an absorbed item the unloading charge of one dollar per car. And since the Creson Company as the sales agent of respondents also paid to the stock yards company the yardage charges of thirty-five cents per head the Creson Company recognized the double

capacity of the stock yards company as the servant of the carrier in unloading the cattle and thereafter as the servant of the consignee in transferring them from the unloading pens to the consignee's sales pens. Respondents were bound by the acts of their agent the Commission Company.

Respondents rest heavily for support of their contention of non-delivery to the consignee upon the fact that the cattle were discharged from the cars into locked unloading pens under the control of the stock yards company the ''paid agent'' of the carrier. The stock yards company was the paid agent of the carrier only for the labor of unloading the cattle, notifying the consignee of their arrival and safely keeping them for the consignee. In respect of all other services, the stock yards company was the paid agent of the consignee. The unloading pens were kept locked solely for the preservation of the identity and for the security of the property contained in them and not by way of any exercise of dominion or possession adverse to the consignee. In like manner and for the like reasons the doors of terminal warehouses are kept locked for the protection of the stored property of consignees.

For the reasons stated, so much of the opinion of the Springfield Court of Appeals in the case of Carr v. St. Louis-San Francisco Ry. Co., 284 S. W. 184, as conflicts with the views here expressed on the the question examined is overruled, the opinion of the Kansas City Court of Appeals in the instant case (Burton v. Wabash Railway Co., 22 S. W. (2d) 201) is approved, and the judgment of the court below is reversed. *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion by FITZSIMMONS, C., is adopted as the opinion of the court. All of the judges concur.