# SECRETARY OF AGRICULTURE *v.* UNITED STATES ET AL.

NO. 480.

Argued April 27–28, 1954.—Decided June 7, 1954.

*Neil Brooks* argued the cause and filed a brief for appellant in No. 480.

*Maxwell W. Wells* argued the cause for appellants in No. 481. On the brief were *Mr. Wells* for the Florida Citrus Commission et al., *John F. Donelan* and *Preston B. Kavanagh* for the California Citrus League et al., *Sidney Goldstein, Francis A. Mulhern, Wilbur LaRoe, Jr., Arthur L. Winn, Jr.* and *Samuel H. Moerman* for the Port of New York Authority, *James J. Thornton* and *G. Gary Sousa* for the City of New York, *Earl J. Gratz* and *David B. Fitzgerald* for the Philadelphia Terminals Marketing Association et al., and *Wilmer A. Hill* for the United Fresh Fruit & Vegetable Association et al., appellants in No. 481.

*Edward M. Reidy* argued the cause for the Interstate Commerce Commission, appellee. With him on the brief was *Leo H. Pou.*

*Hugh B. Cox* argued the cause for the Baltimore & Ohio Railroad Co. et al., appellees. With him on the brief were *Francis L. Brown, A. P. Donadio, Joseph F. Eshelman* and *Charles A. Horsky.*

Mr. Justice Frankfurter delivered the opinion of the Court.

Five railroads which transport fruits and vegetables into New York and Philadelphia filed with the Interstate Commerce Commission schedules of charges for unloading services performed by them at these points. Various shippers and shipper organizations, State Commissions, and other interested parties, protested the proposed

charges. The Secretary of Agriculture, acting on behalf of the affected agricultural interests, intervened.[1] The Commission in due course approved the charges, 272 I. C. C. 648. On further consideration, the approved charges were cut roughly in half, 286 I. C. C. 119. Complaints against even these reduced charges were then filed with the Commission, but these were dismissed by it on the basis of its prior decision, and this litigation to enjoin and set aside the Commission's order followed. 28 U. S. C. §§ 1336, 2325. Numerous parties again intervened—the shipper and consumer interests on the side of the protestants, and the carriers involved on the side of the Commission. The three-judge district court, with Judge De Vane dissenting, upheld the Commission, 114 F. Supp. 420. Direct appeals under 28 U. S. C. § 1253 brought the cases here. 347 U. S. 902.

The general rule is that it is the responsibility of the carrier, as part of the transportation service covered by the line-haul rate, to "deliver" the goods by placing them in such a position as to make them accessible to the consignee. Normally unloading is not a part of the delivery and is performed by the consignee. In accordance with these principles, the railroad spots the car on the team track in its yards in the destination city, and the consignee is given appropriate free time in which to unload. In the case of private sidings, the railroad's job ends when it has placed the car on the consignee's siding.

These are not inflexible rules. The law recognizes and reflects the practicalities of transportation by rail and the diversities to which they give rise. Prior to 1925, the railroads, in order to meet the demands of competitive transportation industries, performed the unloading

---

[1] Under 7 U. S. C. § 1291, the Secretary of Agriculture is authorized to make complaint to the Commission as well as to intervene before the Commission and resort to original and appellate judicial remedies in cases affecting the transportation of farm products.

648

without additional charge at specified points. In the case of *Loading and Unloading Carload Freight*, 101 I. C. C. 394, the Commission approved tariffs by the railroads abolishing free unloading at most of these points, and authorized the carriers to make an additional charge thereafter for performing the unloading at the consignee's request. By the time the present proceeding was instituted, Philadelphia and New York were the only points where the carriers were still performing unloading without any charge in addition to the line-haul rate.

The exception of these two cities was no aberration. It is the result of special conditions which exist in New York and Philadelphia. The significance of these special conditions is at the heart of this controversy.

No railroad carrying fruits or vegetables into New York, except the New York Central, has a direct line into Manhattan. The roads transporting the bulk of the produce into New York, the Pennsylvania and Erie Railroads, terminate their lines on the Jersey side of the Hudson River. There, the cars are put on barges and floated across the river, either to be switched onto the carriers' Manhattan team tracks or to be unloaded directly at the Duane Street piers.[2] These pier terminals are leased by the City of New York to the various carriers and are strategically located adjacent to Washington Market, New York's largest fruit and vegetable market. At the team tracks, according to the usual practice, the consignees do their own unloading. However, because of the inadequacy of these facilities and because of the more advantageous location of the pier terminals, approximately 75% of the fruits and vegetables coming into New York are directed to the pier stations.

---

[2] The New York Central and the Baltimore & Ohio Railroads also perform such floatage.

The procedure at the pier stations is as follows. When the floats are docked at the appropriate pier—this usually happens at night—work crews of the railroad begin to unload the cars and place the contents on the pier floor.[3] The consignees are notified in advance of the arrival of their goods, and at specified times their trucks can come onto the pier floor to pick up their merchandise. Sales and auction facilities are also provided by the railroads, and some of the produce is immediately disposed of in this manner. In no event are the consignees allowed to unload the cars themselves; indeed the Commission has found that this would be "impracticable." [4]

At Philadelphia, the situation is somewhat different. Here there is no problem of water transportation, and the team track facilities where consignees can do their own unloading are not shown to be inadequate. However, in 1927, the Pennsylvania and the Baltimore & Ohio built competitive produce terminals,[5] and, because of the special facilities available there, 95% of the fruits and vegetables consigned to Philadelphia are now received at these stations. Each of these terminals has two platforms, one for produce intended for private sale, one for produce intended for auction sale. The unloading operations here are considerably simpler and cheaper than at the

---

[3] The unloading practices vary somewhat from carrier to carrier. For example, the Erie has a special contractor do its unloading; the Pennsylvania uses automatic equipment instead of manual labor.

[4] 272 I. C. C., at 655. In its later report, the Commission also made the somewhat inconsistent finding that "at the original hearing the railroads offered to permit consignees to unload their freight from the car float." 286 I. C. C., at 125. But when the California Fruit Growers Exchange, after the Commission's initial decision, requested the railroads to "permit the consignees, as a whole, to perform the unloading at the piers" the railroads refused.

[5] The B. & O. terminal is used jointly by it and the Reading Railroad.

New York piers; but, as in New York, all the unloading here is performed by the carriers.[6]

It was in the light of this background that the carriers, faced by the sharply rising costs of the unloading operation, sought the Commission's approval for special unloading charges at these two cities. Such charges, the carriers urged, would serve to bring New York and Philadelphia into line with the generally prevailing practice—that consignees must either do their own unloading or, if they want the carrier to do it for them, they must be prepared to pay for it.

The protestants, appellants here, do not challenge these general principles. It is their contention rather that at these particular points the unloading is an essential part of delivery in that without it the goods are not accessible to the consignees; that therefore the line-haul rate encompasses the unloading; and, finally, that a service covered by the line-haul rate cannot be separately compensated unless the carriers show that the line-haul rate is inadequate to cover it.

These are claims that must be met, and the real question before us is whether the Commission has met them with an adequacy that satisfies the requirements of judicial review, limited though its scope may be. With respect to New York, the Commission's findings clearly show that since the consignees were not permitted to do

---

[6] At Philadelphia, too, the consignees requested the carriers to be permitted to do their own unloading, or to let the auction company which was selling the fruit on their account do the unloading. The Pennsylvania refused, on the ground that the "terminal was a public facility and that the granting of such permission might give rise to a dual method of unloading, one to be conducted by the fruit and vegetable trade, and the other by the railroad for the general public." 286 I. C. C., at 137. In this connection, it should be noted that the Commission made no findings that it would be "impracticable" for the consignees to do the unloading at the Philadelphia produce terminals.

their own unloading, the goods were not accessible to them until unloaded by the carriers.[7]  Cf. *United States* v. *United States Smelting Co.,* 339 U. S. 186.  Moreover, prior cases of the Commission dealing with the New York terminal have indicated that the unloading cost there is an integral part of the through rate. See *Fruits and Vegetables to Duane St., N. Y.,* 66 I. C. C. 135, 139; *Erie R. Co.* v. *Alabama & V. R. Co.,* 98 I. C. C. 268, 272, 280–281.  Yet the court below attributed to the Commission findings that "the line haul service terminated when the cars reached the pier station," and that "unloading is an additional service, wholly distinct from delivery."  114 F. Supp., at 424.  But the findings of the Commission, taken as a whole, do not support these statements.

Prior cases where the Commission had sustained the imposition of unloading charges do not serve as useful precedents here.  *E. g., Loading and Unloading Carload Freight, supra.*  In those cases, there was an absence of circumstances to justify deviation from the normal rule that unloading is not part of delivery, and therefore the Commission was warranted in concluding that the carrier might impose a separate charge for the unloading where the consignee requested it.  Here, however, because of the peculiar conditions prevailing at the New York piers,

_____

[7] 272 I. C. C. 648, 654–655: "Delivery to the consignee is not effected until after the cars are unloaded and the lading placed at a convenient location on the pier floor."  286 I. C. C. 119, 125: "The pier floor is the first place where, after the freight has been unloaded, delivery can be taken."  286 I. C. C. 119, 127: "After the vegetables are placed on the pier platform they are accessible to the consignee . . . ."  286 I. C. C. 119, 129: The proposed charge, in addition to the line-haul rate, is "for making delivery at New York piers."

The relation between the unloading charges and the line haul was also adverted to in the Commission's earlier report, 272 I. C. C., at 662, but not with sufficient clarity.

the unloading is an essential part of the delivery and hence is necessarily encompassed in the line haul. Instead of treating this situation on its own merits, the Commission appears to have relied too much on prior decisions dealing with the problem of unloading charges in different contexts.

While the normal course for the Commission in dealing with a situation like the present would have been to re-examine the sufficiency of the line-haul rate, or to initiate a new division of the existing line-haul rate,[8] the Commission was not precluded from following a procedure fairly adapted to the unique circumstances of this case. The Commission may not unnaturally have felt that it would be undesirable to revise the line-haul rate with its inevitable effect on the entire tariff structure, in order to deal appropriately with the special, localized situation presented at the New York piers. Or the Commission might well have thought that a redivision of the line-haul rate would not be appropriate for the substantial additional cost here involved.

It is not necessary now to consider the Commission's power, under appropriate findings, to approve such unloading charges without pursuing one of these courses. In dealing with technical and complex matters like these, the Commission must necessarily have wide discretion in formulating appropriate solutions. But we do say that while the Commission has adumbrated the reasons

---

[8] Under 49 U. S. C. § 15 (6), the Commission may authorize a new division of the rate among the participating carriers if it finds the present division "unjust, unreasonable, [or] inequitable." In such a proceeding special terminal costs can be taken into account prior to allocating the rate among the line-haul carriers. See *Erie R. Co.* v. *Alabama & V. R. Co.*, 98 I. C. C. 268, 280; *Atlantic Coast Line R. Co.* v. *Arcade & A. R. Corp.*, 194 I. C. C. 729, 745–747; *Official-Southern Divisions*, 287 I. C. C. 497, 538–543; *Official-Southwestern Divisions*, 287 I. C. C. 553, 584–593.

that commended these charges to its approval,[9] the Commission has not adequately explained its departure from prior norms and has not sufficiently spelled out the legal basis of its decision. We do not know whether the Commission has disregarded its own findings that the unloading here is a prerequisite to delivery of the goods; or whether, in order to meet an unusual situation, the Commission has modified the normal doctrine that delivery is the responsibility of the carrier, see *New Eng-*

---

[9] As the Commission stated:

"An unusual situation, arising primarily from the topography of the area, exists on lower Manhattan as a result of which the present method of handling shipments through the pier stations is of benefit to both shippers (including consignees) and carriers. It is also helpful in the avoidance of traffic congestion. The acquisition of land in that area for additional track facilities would be impracticable if not impossible. . . . Physical conditions in and around New York which limit available space for the establishment and operation of railroad terminal facilities is a general community problem and obviously there should be some sharing between the carriers and their patrons of the burden of overcoming the existing difficulties if this congested area is to be served by railroad transportation." 286 I. C. C., at 139–140.

The Commission also made reference to figures introduced by the carriers showing the considerable disparity between the cost per car of making team track delivery and cost per car of making terminal delivery, including unloading (286 I. C. C., at 131):

NEW YORK

| | Manhattan Team Tracks | Pier Terminals |
|---|---|---|
| Erie | $45.44 | $83.87 |
| Pennsylvania | 73.57 | 122.73 |
| B. & O. | 70.46 | 119.86 |

PHILADELPHIA

| | Team Tracks | Produce Terminals |
|---|---|---|
| Pennsylvania | $39.64 | $109.36 |
| B. & O. | 27.66 | 75.94 |

*land Coal & Coke Co.* v. *Norfolk & W. R. Co.,* 33 I. C. C. 276; or whether the Commission, for a reason not made explicit, has here deemed irrelevant the prevailing rule of its prior cases that a service necessarily encompassed by the line-haul rate cannot be separately restated without examining the sufficiency of the line-haul rate to cover it. See, *e. g., Terminal Charges at Pacific Coast Ports,* 255 I. C. C. 673; *Unloading Lumber to New York Harbor,* 256 I. C. C. 463. In short, the Commission has not explained its decision "with the simplicity and clearness through which a halting impression ripens into reasonable certitude. In the end we are left to spell out, to argue, to choose between conflicting inferences. Something more precise is requisite in the quasi-jurisdictional findings of an administrative agency. *Beaumont, S. L. & W. R. Co.* v. *United States,* 282 U. S. 74, 86; *Florida* v. *United States,* 282 U. S. 194, 215. We must know what a decision means before the duty becomes ours to say whether it is right or wrong." *United States* v. *Chicago, M., St. P. & P. R. Co.,* 294 U. S. 499, 510–511.

Appellants also contend that to permit separate charges to be imposed for the unloading of fruits and vegetables, while not imposing similar charges on other commodities unloaded at these points, violates §§ 2 and 3 of the Interstate Commerce Act.[10] Since we have already concluded that the case should be remanded to the Commission, the Commission on remand should also make

---

[10] 49 U. S. C. § 2 prohibits a carrier from charging or receiving "a greater or less compensation for any service rendered . . . than it charges . . . any other person . . . [for] a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances . . . ."

Section 3 (1) makes it unlawful for any carrier to subject "any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever . . . ."

more explicit findings as to the differences and similarities in the treatment accorded other commodities unloaded at these same points. If such commodities are unloaded "under substantially similar circumstances," the Act requires that the charges imposed be the same. If, on the other hand, there are important differences in treatment justifying the imposition of different unloading charges or of no unloading charges at all, the Commission ought to find no difficulty in defining the differences.[11]

Similarly, we deem it desirable that upon reconsideration of this controversy, the Commission should also be more explicit in stating the reasons that led it to assimilate, so far as these unloading charges are concerned, the situation at Philadelphia to that at New York.

The judgment is vacated, and the cases are ordered to be remanded to the Commission for further proceedings not inconsistent with this opinion.

*It is so ordered.*

THE CHIEF JUSTICE, MR. JUSTICE BLACK, and MR. JUSTICE DOUGLAS would hold the Commission's order invalid and enjoin its enforcement on the ground that the Commission failed to determine the reasonableness of the railroads' line-haul rates on the basis of increased unloading rates allowed by the Commission.

MR. JUSTICE JACKSON took no part in the consideration or decision of these cases.

---

[11] In its latest report, the Commission stated that "as regards the movement of freight, other than fruits and vegetables . . . the operation is identical with the manner in which fruits and vegetables are car-floated and unloaded." 286 I. C. C., at 123. Without more, the Commission then concluded that "the record does not warrant a finding of undue preference and prejudice or unjust discrimination in violation of sections 2 or 3 of the act." 286 I. C. C., at 142.