REPUBLIC CARLOADING AND DIS-
TRIBUTING CO., Appellant,

v.

MISSOURI PACIFIC RAILROAD COM-
PANY, Appellee.

No. 16698.

United States Court of Appeals
Eighth Circuit.

May 3, 1962.

George F. Gunn, Jr., of La Tourette & Rebman, St. Louis, Mo., for appellant.

Robert W. Yost, St. Louis, Mo., and M. M. Hennelly and A. D. Churchill, St. Louis, Mo., on the brief, for appellee.

Before VOGEL, VAN OOSTERHOUT and BLACKMUN, Circuit Judges.

BLACKMUN, Circuit Judge.

By this action, removed from a Missouri state court, Republic Carloading and Distributing Co. seeks to recover from Missouri Pacific Railroad Company the value of certain interstate less-than-carload freight lost in St. Louis between October 1955 and October 1958. Jurisdiction is established under 28 U.S.C.A. § 1337.

Republic is a freight forwarder under Part IV of the Interstate Commerce Act and as defined by § 402(a) (5) thereof, 49 U.S.C.A. § 1002(a) (5).[1] The Missouri Pacific is a common carrier by railroad under Part I of the Act and as defined by § 1(3) (a) thereof, 49 U.S.C.A. § 1(3) (a). Republic, pursuant to the responsibility imposed upon it as a freight forwarder by §§ 413 and 20(11) of the Act, 49 U.S.C.A. §§ 1013 and 20 (11), has paid its shippers their claims for the freight lost. It now looks to the railroad, under § 20(12), 49 U.S.C.A. § 20(12), for reimbursement for those payments.

1. "The term 'freight forwarder' means any person which (otherwise than as a carrier subject to chapters 1, 8, or 12 of this title) holds itself out to the general public as a common carrier to transport or provide transportation of property, or any class or classes of property, for compensation, in interstate commerce, and which, in the ordinary and usual course of its undertaking, (A) assembles and consolidates or provides for assembling and consolidating shipments of such property, and performs or provides for the performance of break-bulk and distributing operations with respect to such consolidated shipments, and (B) assumes responsibility for the transportation of such property from point of receipt to point of destination, and (C) utilizes, for the whole or any part of the transportation of such shipments, the services of a carrier or carriers subject to chapters 1, 8, or 12 of this title."

The case was tried to the court upon the pleadings, the railroad's request for admissions, Republic's answers thereto, and stipulated facts. Each side moved for summary judgment pursuant to Rule 56, F.R.Civ.P., 28 U.S.C.A. The railroad's motion was sustained and Republic's motion was overruled. Judgment was entered accordingly. Republic has appealed.

In its business as a freight forwarder Republic owns no transportation equipment. It utilizes instead the services of common carrier rail or truck lines. Its principal function as a forwarder is to consolidate smaller shipments into carload or truckload lots so as to obtain the benefit of carload or truckload rates. These rates are less per unit than less-than-carload rates and do not include a carrier's loading or unloading services.

The freight was lost while it was at a St. Louis freight depot. Portions of this depot had been leased by the Missouri Pacific, as owner, to Republic. The issue, at least as stated in a pre-trial order, is whether the railroad "was a common carrier and therefore responsible for loss or disappearance of shipments" from the depot.

*The Lease.* The lease is one executed February 24, 1956, but made retroactive to September 1, 1952. It relates to an old freight depot area owned by the railroad at Main and Gratiot Streets, St. Louis. By it the railroad [2] leased to Republic designated portions of a freighthouse building and also granted Republic "the right to use, in common with Lessor or others, such additional space or area on" the platform portion of the freighthouse building and on a separate open freight platform on the other side of five loading tracks "as may be necessary for temporary accommodation of freight actually or constructively in possession of Lessee under provisions of Section 8 of this agreement". The two platform areas together were called the "Lessor's Freight Platform."

Paragraph 8 of the lease has particular pertinency. By it the parties agree (1) that freight on the Platform with respect to which the railroad does not receive a road haul by rail "shall at all times be deemed to be in the possession of" Republic; (2) that "loss of or damage to freight being handled from highway truck to highway truck shall, at all times, be the liability of the Lessee"; and (3) that, except with respect to such a truck-to-truck situation and other exceptions not here pertinent, "loss of or damage to freight on Lessor's Freight Platform and Premises shall be the liability of the party having possession of the freight under the provisions of this agreement, at the time of the loss or damage".

The portions of the depot occupied by Republic under the lease were used by it for the receipt, consolidation and forwarding of freight moving, or to be moved, on bills of lading issued by Republic, or, in other words, the depot's use by Republic was confined to the handling of Republic's freight forwarding traffic.

*The shipments.* The less-than-carload shipments in question had all moved, or were to be moved, interstate on through bills of lading issued by Republic. They either (1) had been transported to St. Louis and the depot by common carrier truck, or (2) had been transported to St. Louis by common carrier railroad, other than the Missouri Pacific, in which case the Missouri Pacific received tariff-specified switching charges for its services in switching the cars containing the shipments from its St. Louis connection to the depot, or (3) had originated in St. Louis and had been transported to the depot by local truckers hired by Republic or its shippers. The shipments had been consolidated, or were to be consolidated, with other less-than-carload shipments moving on bills of lading issued by Republic and had been transported, or were to be transported, as parts of carloads or truckloads on additional bills of

2. The lease was actually executed by the railroad's predecessor, its Trustee in reorganization, but the railroad succeeded to all the Trustee's rights and assumed all his obligations under the lease.

lading issued to Republic by the common carrier rail or truck lines. The carriers' bills of lading for all carloads or truckloads into St. Louis showed Republic as both consignor and consignee and St. Louis as the destination. If an incoming shipment was to continue beyond St. Louis it would be included in a new carload or truckload for which a new bill of lading was issued by the outbound carrier naming Republic as the shipper and consignee.

*Unloading and Loading.* Shipments originating in St. Louis were unloaded at the depot by the local truck driver. All other shipments arriving at the depot were unloaded by Missouri Pacific employees from the car or truck. For this unloading service the railroad received rates set forth in a freight tariff it had filed and published as prescribed by § 6 of the Interstate Commerce Act, 49 U.S. C.A. § 6. This tariff related specifically to charges at this St. Louis depot for services in unloading or loading "on request of shipper". Upon unloading each shipment was moved by the railroad employees to the particular loading point on the Platform determined by the final destination specified on the bill of lading issued by Republic and Republic issued a receipt to the inbound carrier acknowledging delivery of the shipment. Some shipments were to be loaded by the railroad employees into cars for subsequent movement by rail. Others were to be loaded by those employees into common carrier trucks for further movement. For these loading services the railroad also received the rate set forth in the freight tariff. Shipments for delivery to St. Louis destinations were placed by the railroad employees on the Platform for loading by the local trucker into local trucks.

In summary, therefore, except for the unloading from local trucks of shipments originating in St. Louis and except for the loading into local trucks of shipments for St. Louis delivery, the railroad employees did the unloading and loading.

It was between the time the shipments in question were unloaded and placed on the Platform and the time they were to be finally loaded into a car or truck that the losses took place. Each shipment, thus, at the time of the loss had not been delivered to the consignee named in Republic's bill of lading and was still on the Platform. The car or truck into which it was to be loaded had not yet been completely loaded and Republic had not yet issued complete instructions to the outbound carrier.

The Missouri Pacific was not a line haul carrier of any shipment in controversy, did not receive a line haul or any division of the line haul charge from the line haul carrier, did not receive from Republic any instructions under which it was to receive a line haul, and did not issue any bill of lading or other document acknowledging receipt of the shipment as a common carrier.

Neither the Missouri Pacific nor Republic has any evidence as to the cause of the losses.

Republic contends that at the time of loss each shipment had not yet reached its final destination point; that it was still in transit in interstate commerce; that the unloading and loading services rendered by the Missouri Pacific at the depot were performed by it as a common carrier in an overall interstate transaction; that the loss took place while the railroad was acting in this capacity; that the freight, therefore, never came into Republic's possession; and that any provisions of the lease which might be taken to relieve the Missouri Pacific of responsibility were not effective because, the lease cannot abrogate the railroad's common carrier liability.

The Missouri Pacific contends that at the time of each loss transportation of the inbound car or truck had been completed or transportation of the outbound car or truck had not yet begun; that there was an interval between the transportation in and the transportation out; that the lease was effective and applicable to that interval; that by the lease the possession of the shipment, and hence liability therefor, was in Republic and not in the railroad; that the unload-

ing service provided by the railroad had been rendered and had ceased; and that the presence of a bill of lading issued by Republic to its shipper and the fact Republic had not yet completed the transportation required by its bill of lading were matters between Republic and its shipper and have no bearing on the obligations of the railroad to Republic.

■ We observe, initially, and repeat for emphasis, that with respect to each shipment there were two bills of lading outstanding. One was issued, as to the less-than-carload item or items, by Republic to its customer-shipper. The other was issued, as to the consolidated carload or truckload, by the common carrier railroad or highway truck showing Republic as both consignor and consignee. The Missouri Pacific issued neither of these bills of lading and was not named therein in any capacity. Republic was thus a common carrier with respect to its customer-shipper but it was also a shipper-consignee with respect to the carriers whose carload or truckload services it utilized. Chicago, M., St. P. & P. R. R. v. Acme Fast Freight, 1949, 336 U.S. 465, 467–468, 69 S.Ct. 692, 93 L.Ed. 817. See National Carloading Corp. v. United States, 1955, 95 U.S.App. D.C. 208, 221 F.2d 81, 84 and 86. What this case concerns is not the first relationship but, rather, the second, that is, Republic's posture as a shipper-consignee, on the one hand, and Missouri Pacific, which Republic claims to be functioning as a common carrier with respect to the shipments, on the other. Furthermore, none of the carload or truckload shipments was made on a bill of lading *through* St. Louis. Although a particular inbound less-than-carload shipment might be headed for an ultimate destination beyond St. Louis, it arrived at St. Louis on a carrier's carload or truckload bill of lading with St. Louis as its destination and with Republic as the consignee, and it was to proceed from St. Louis on a new carload or truckload bill of lading issued by the outbound carrier with destination designated and Republic again as the consignee.

■

With these observations in mind, we move on, first, to the question of Missouri Pacific's status as a common carrier at the time of the losses and, then, to the question of the application of the parties' lease. The parties by their stipulation seem to have separated the shipments into four categories:

1. In by local truck; out by rail. The first category consists of those shipments which originated in St. Louis, were transported to the depot by local truck, were unloaded to the Platform by the driver of that local truck, were to have been loaded by Missouri Pacific employees into a car in consolidation with other shipments, and were to have departed from the depot and St. Louis by rail. The shipments were lost after unloading but before being loaded by the railroad employees into the railroad car.

■ In order that a railroad have the status and absolute liability of a common carrier with respect to a shipment, the shipper must have delivered the freight into its possession, the delivery must be for immediate transportation, and the shipper must give the carrier appropriate shipping instructions. Missouri Pac. Ry. v. McFadden, 1894, 154 U.S. 155, 160–161, 14 S.Ct. 990, 38 L.Ed. 944; National Union Fire Ins. Co. v. Atlantic & E. C. Ry., 4 Cir., 1952, 193 F.2d 943, 944; Harris, Cortner & Co. v. Louisville & N. R. R., 5 Cir., 1921, 276 F. 277, 280; Delta and Pine Land Co. v. Illinois C. R. R., 1957, 231 Miss. 487, 95 So.2d 572, 575, and cases cited.

■ It follows that the Missouri Pacific does not have common carrier liability with respect to losses of these first category shipments. These shipments were not even handled by the railroad. They were, instead, delivered by the local truck driver to Republic at the depot and were receipted for there by Republic's receiving clerk. There was no delivery to the railroad for immediate transportation; there was no bill of lading yet issued by the outbound carrier; and there were no complete shipping instructions yet issued by Republic as shipper.

2. In by rail; out by common carrier truck. The second category consists of those shipments which were transported to St. Louis by rail, other than Missouri Pacific, were switched to the depot by the Missouri Pacific from its yard connection, were unloaded by Missouri Pacific employees to the Platform, were to have been loaded by those employees into a truck in consolidation with other shipments, and were to have departed from the depot and St. Louis by common carrier truck. The shipments were lost after unloading from the car but before loading into the truck.

■ Common carrier liability ceases upon delivery of the shipment to the consignee. Delivery of a carload shipment, such as is involved in this category, is normally effected when the car is placed on a team track or spotted. Secretary of Agriculture of U. S. v. United States, 1954, 347 U.S. 645, 647, 74 S.Ct. 826, 98 L.Ed. 1015; Jones v. Thompson, 1950, 360 Mo. 285, 228 S.W.2d 673, 676. The case of Southern Advance Bag & Paper Co. v. Terminal R. Ass'n., Mo.App., 1943, 171 S.W.2d 107, 112, is to the same effect, appears to be parallel on its facts to the situation here (unloading by employees of Washington University in St. Louis of carload shipments for the University's tenants), and clearly points out the distinction between carload and less-than-carload shipments so far as delivery and termination of common carrier liability are concerned. See also Burton v. Wabash Ry., 1933, 332 Mo. 268, 58 S.W.2d 443.

■ It seems then inevitably to follow that the interstate transportation of any shipment in this category ceased when the car was placed at the Platform and Republic issued its receipt to the inbound carrier acknowledging delivery, and that the railroad's common carrier liability terminated at that point. The Missouri Pacific services thereafter, consisting of unloading the carload, were performed by it "on request of shipper" as specified in the tariff. That shipper was Republic. It was not the line haul carrier.

3. In by rail; out for local delivery by truck. The third category is identical to the second except that the shipments were to be loaded from the Platform into a local truck for local delivery. That loading, however, was to be performed by the driver of the local truck and not by Missouri Pacific employees. Exactly the same result ensues as with second category shipments and what we have said there is applicable here.

■ 4. In by common carrier truck; out by common carrier truck. The fourth category consists of those shipments which were transported to St. Louis and the depot by common carrier truck, were unloaded by Missouri Pacific employees to the Platform, were to have been loaded by those employees into another common carrier truck in consolidation with other shipments, and were to have departed from the depot and St. Louis by this second truck. The shipments were lost after unloading but before loading.

Here, again, the inbound carrier's truckload services did not include unloading. Its carriage for Republic was complete when its truck was placed at the depot. The Missouri Pacific's unloading services were performed for Republic as consignee.

This discussion as to the four categories embraces conclusions in each instance that the Missouri Pacific's unloading services were not performed while acting as a common carrier of the shipments in question. As a consequence, Republic's argument that common carrier liability applies wholly apart from any provisions of the lease and that the parties cannot, under § 20(11) of the Act, by the lease, contract away this liability of the railroad, loses its entire foundation.

■ We may then turn to the lease to see what the parties themselves agreed with respect to losses. There is no question that the lease covered the period of these shipments and that it was valid. See General American Tr. Corp. v. Indiana Harbor Belt R. R., 7 Cir., 1951, 191 F.2d 865, 872, cert. den. 343 U.S. 905, 72

S.Ct. 636, 96 L.Ed. 1324. It provides specifically that loss of freight handled from highway truck to highway truck was at all times the liability of Republic. This covers the fourth category of shipments. The lease further states that freight loss shall be the liability of the party having possession of the freight, as described in the lease, at the time of the loss. It states that freight with respect to which the Missouri Pacific does not receive a road haul by rail or any instructions under which it was to receive a road haul by rail shall at all times be deemed to be in the possession of Republic. None of the shipments in the remaining three categories received or was to receive a Missouri Pacific road haul by rail. By the lease, therefore, (a) this freight at all times on the Platform was in Republic's possession and (b) its loss was the liability of Republic.

Republic appears to rest its argument primarily upon the case of Keystone Motor Freight Lines v. Brannon-Signaigo C. Co., 5 Cir., 1940, 115 F.2d 736. The facts of that case, however, are very different. There the truck carrier, when it arrived at the destination city behind schedule on a Saturday afternoon, tried to deliver the goods but found the consignee's place of business closed. By special contract it arranged to have the shipment stored at the dock of another carrier which regularly made local deliveries for the first carrier. The goods were stolen over the weekend. In affirming judgment for the first carrier against the second, the Fifth Circuit observed, p. 738, that "mere arrival of goods at their destination does not reduce the liability of the carrier to that of a warehouseman where anything remains to be done by the carrier in order to effectuate a delivery" and held that the second carrier's pickup and delivery service arranged for by the special contract was a necessary link in the interstate transportation and that it was a connecting and delivering carrier in possession when the loss occurred. In the case before us, however, delivery to Republic as shipper-consignee had been effected, the interstate carriage had ceased, the goods were in the possession of Republic, and the losses thereafter took place.

Galveston Wharf Co. v. Galveston, H. & S. A. Ry., 1932, 285 U.S. 127, 52 S.Ct. 342, 76 L.Ed. 659, also cited by Republic, is similarly to be distinguished. There the Wharf Company, although performing only unloading and loading services, was a link in the uncompleted interstate carriage by a water carrier and a rail carrier. It was held liable for loss of goods while they were in its possession. The shipment was clearly in mid-stage. In the case before us it had been completed.

Certain arguments made by Republic perhaps require passing comment:

(a) Republic suggests that because the Missouri Pacific's unloading and loading services were performed pursuant to a tariff filed and published in accord with § 6 of the Act, because these services were obviously within the definition of "transportation" in § 1(3) (a), 49 U.S.C.A. § 1(3) (a), and because the Interstate Commerce Commission has jurisdiction over charges for these services, citing Secretary of Agriculture v. United States, supra, 347 U.S. 645, 74 S.Ct. 826, 98 L.Ed. 1015, and Ex Parte 223, Increased Freight Rates (I.C.C. 1960) with its application to loading and unloading charges performed by class I railroads, the Missouri Pacific's unloading services were necessarily performed as a common carrier and these services were in the nature of common carriage. It also asserts that the railroad, by raising as a defense the limitation period specified in § 20(11) of the Act and in the Uniform Bill of Lading, admits its common carrier capacity because this defense is available only to such a carrier.

■ The conclusion suggested does not follow from the premise. The Missouri Pacific is a railroad. It is subject, by § 1 of the Act, to the Act's Part I. It must comply with § 6 which requires the filing of schedules of rates for all its charges for transportation as defined in § 1(3) (a). That definition is a wide one

and includes "all instrumentalities and facilities of shipment or carriage * * and all services in connection with the receipt, delivery, * * * and handling of property transported". As so defined the term is broader than the pure transportation service of which common carriage consists. It includes services which may occur before or after actual carriage. Examples of this are icing of cars, weighing, storage, and loading and unloading. The purpose of having the Commission supervise these extra-carriage services is apparent from Cleveland, C., C. & St. L. Ry. v. Dettlebach, 1916, 239 U.S. 588, 594, 36 S.Ct. 177, 180, 60 L.Ed. 453:

> " * * * [I]t is evident that Congress recognized that the duty of carriers to the public included the performance of a variety of services that, according to the theory of the common law, were separable from the carrier's service as carrier, and, in order to prevent overcharges and discriminations from being made under the pretext of performing such additional services, it enacted that so far as interstate carriers by rail were concerned the entire body of such services should be included together under the single term 'transportation' and subjected to the provisions of the Act respecting reasonable rates and the like."

See Southern Ry. v. Prescott, 1916, 240 U.S. 632, 638, 36 S.Ct. 469, 60 L.Ed. 836. Thus, the mere publication of a tariff does not of itself make the publisher a common carrier or make every service which it performs a part of common carriage with consequent common carrier liability. Riegel Paper Corp. v. Branch Motor Express Co., Sup.Ct., 1960, 207 N.Y.S.2d 697, 698. Compare Ellis v. I. C. C., 1915, 237 U.S. 434, 443, 35 S.Ct. 645, 59 L.Ed. 1036, Lowden v. Simonds–Shields–Lonsdale Grain Co., 1939, 306 U.S. 516, 520–521, 59 S.Ct. 612, 83 L.Ed. 953. And the fixing of the point at which common carrier liability begins or ends is not dependent upon the requirement of filing the tariff but is a matter for the courts and the common

law. Cincinnati, N. O. & T. P. Ry. v. Rankin, 1916, 241 U.S. 319, 326–327, 36 S.Ct. 555, 60 L.Ed. 1022.

■ The fact the limitations defense was raised is of no help to Republic and constitutes no admission. It is an alternative defense which would come into play only if Missouri Pacific's unloading services were determined to have been rendered in a common carrier capacity.

(b) Republic also suggests that under the lease only a small portion of the freight depot is available for its exclusive use; that the right given Republic under the lease to use the Platform had to do only with overflow shipments which could not be placed in the exclusive area; that the lease provisions relating to this user do not apply to freight floored on the Platform for the railroad's convenience while awaiting further loading; and that the freight tariff contemplates immediate reloading.

The freight tariff is by no means so restricted. It does refer to unloading and loading in one continuous operation but it does so only as one of several services described. It also relates directly to unloading alone and to loading alone.

Neither do we think the lease is restricted in the narrow manner suggested by Republic. It contains no language about overflow shipments, about the use of the Platform only after the exclusive area is occupied, about immediate loading, or about convenience use of the Platform by the Missouri Pacific. We also find nothing in the record to indicate that the shipments were on the Platform for the railroad's convenience. The record discloses no request for single operation unloading and loading. The shipments were on the Platform pending Republic's instructions to load or pending the availability of the outbound car or truck.

The legal principles mentioned above have been long established and long accepted. We think that Republic's claims here are founded, not upon a misconstruction of those principles, but upon a basic confusion between the kinds of shipments represented by the two bills of lad-

ing. So far as Republic's customer-shipper is concerned, the shipment was not completed and as between that shipper and Republic the interstate carriage was still in effect when the loss occurred. That is why Republic was liable to its shipper for the loss. But so far as Republic, as shipper-consignee, and the carrier which issued or was to issue to it the carload or truckload bill of lading are concerned, the interstate shipment had ceased, or had not yet begun, when the shipment was on the Platform and the loss occurred. By properly distinguishing between these two co-existing but separate arrangements resultant liability for the loss is readily ascertained.

Affirmed.