No. 12144

IN THE SUPREME COURT OF THE STATE OF MONTANA

1972

---

EISENMAN SEED COMPANY,
a Corporation,

Plaintiff and Respondent,

-vs-

CHICAGO, MILWAUKEE, ST PAUL AND
PACIFIC RAILROAD, a Corporation,

Defendant and Appellant.

---

Appeal from: District Court of the First Judicial District,
Honorable Gordon R. Bennett, Judge presiding.

Counsel of Record:

For Appellant:

Garlington, Lohn and Robinson, Missoula, Montana.
Robert E. Sheridan argued, Missoula, Montana.

For Respondent:

Brazier, Dowling and Erickson, Helena, Montana.
Geoffrey L. Brazier argued, Helena, Montana.

---

Submitted: November 29, 1972

Decided: JAN 16 1973

Filed: JAN 16 1973

Thomas J. Kearney
                                    Clerk

Mr. Justice Wesley Castles delivered the Opinion of the Court.

This appeal is taken from a judgment for plaintiff entered by the district court of the first judicial district, Lewis and Clark County, and the court's subsequent denial of defendant's exceptions to the findings of fact and conclusions of law and its motion to amend such findings of fact and conclusions of law.

The principal issue involved is whether defendant is liable to plaintiff for loss of grain occurring after defendant delivered the shipment to the consignee.

Plaintiff, Eisenman Seed Company (hereinafter referred to as Eisenman), commenced this action in the district court seeking to recover from defendant Chicago, Milwaukee, St. Paul and Pacific Railroad (hereinafter referred to as Milwaukee), certain sums of money as the result of an alleged loss of malting barley occurring on shipments from Fairfield, Montana to Duluth, Minnesota. The basis for Eisenman's claim was that the grain was transported in defective equipment belonging to Milwaukee and further, that Milwaukee was negligent in the transportation, handling and delivery of the grain.

During the year 1968, Eisenman shipped numerous carloads of malting barley from various points along the Agawam branch line of Milwaukee in Montana for delivery to Capital Elevator Co. (hereinafter referred to as Capital), the consignee in Duluth, Minnesota.

Prior to loading, the grain was weighed by Eisenman on automatic scales and this weight was used in preparing the bills of lading. The grain was again weighed upon arrival at Capital in Duluth. According to the testimony of Joe Eisenman, president of Eisenman, the grain was not weighed at Capital until after it was unloaded from the railroad cars. The grain was also weighed on track scales of Milwaukee at Great Falls, but these weights are not at issue in this appeal. The loss covering 39 carloads amounted to 19,200 pounds, or 492 pounds per car. The total judgment here was for $499.20.

As a result of discrepancies between Eisenman's weights and those obtained by Capital, thirty-nine claims were filed with Milwaukee, which form the basis of this litigation. All of the claims involved are commonly referred to as "clear record claims". A clear record claim was defined by Harold Whatmore, a freight claim agent of Milwaukee, as "a movement of a car, which from the point of origin to its point of destination, had no detectable leaks."

Each car upon which a claim was filed was inspected by the Duluth Board of Trade after arrival at Capital, and an official weight inspection certificate issued on the contents after unloading. The following excerpt from Mr. Eisenmen's testimony indicated, as did the individual weight and inspection certificates, that no defects were noted on any of the cars and no leaks were detected.

> "Q. Well, let me ask you this: For each one of the claims that you have filed, you have received from the railroad a copy of the Duluth Board of Trade official weight certificate, is that not correct? A. That's right.

> "Q. And for each one of the weight certificates, an inspection form must be filled out by the supervising weighmaster, is this not also true? A. That's right.

> "Q. And on each one of these cars, or these claims that are filed, it's noted that that particular weighmaster checked the box car and noted no leaks detected? A. Yes."

The testimony of Mr. Eisenman was corroborated by that of Mr. Whatmore. Thus, the proof that the 39 cars were delivered intact.

Capital, the consignee, had been designated by Eisenman through its broker, Hufford & Hufford. Milwaukee had nothing to do with the designation of the consignee. The grain was unloaded at Duluth by Capital and no employees or agents of the railroad took part in the unloading process. There was also no affiliation or agreement between Milwaukee and Capital by which the latter could have been construed as the agent of Milwaukee.

The unloading of the grain took place at a private siding belonging to Capital in Duluth. Milwaukee was then notified by Capital that each car was released to the railroad after it was unloaded.

- 3 -

The uncontroverted testimony of Mr. Eisenman was that the grain loss was occurring because the cars were improperly unloaded at Capital, with the result that grain was being left in the cars. Because of the importance of this testimony, we quote verbatim the following excerpts from the transcript:

"Q. (By Mr. Sheridan, counsel for defendant) In the unloading of the grain, the grain is often left in the car---now, is that clear enough in that form of question? A. Yes.

"Q. The grain simply is not all dumped out of the car, is that not right? A. Yes.

"Q. The grain is just not all dumped out of the car--- A. Right.

"Q. ---by the mechanism they use? A. That's right.

"Q. And could you describe for me how Capital Elevator Company, if you know, unloads the grain out of these cars? A. Well, I can't give you the exact procedure that they use to unload them, other than the regular unloading methods that you'd find at any terminals.

"And that is, that they dump these cars into hoppers and then they are automatically weighed after they are dumped into hopper cars and then set back on the track, and that is the actual grain that's dumped out of the cars---the actual weight, but our point is this: How much was actually left in the car after it was dumped.

" * * *

"Q. So it's your feeling that these cars aren't being properly unloaded when they arrive at Duluth, is that not correct? A. I would have to say 'Yes' to that question.

"Q. And that you're not being given credit for the grain which you shipped from Great Falls simply because the grain was not being properly unloaded at Capital Elevator? A. Yes.

"Q. And there was grain being left in the cars that were returned to you, or to whoever else that car is returned to? A. That's right.

"Q. And you feel that this happens on practically every car? A. Well, I would not say every car, but it happens on a good percentage of the cars, Mr. Sheridan, yes."

Two other facts are essential to a determination of this case.

(1) On October 9, 1970, Eisenman submitted requests for admissions to Milwaukee, one of which was:

"15. That sloppy unloading and car cleaning practices at the point of destination may cause losses in the

deliveries of grains by interstate common carriers for hire, including railroads."

On October 23, 1970, Milwaukee admitted the above request but emphasized that in this instance the unloading and car cleaning was not performed by, nor was it the responsibility of Milwaukee.

(2) The freight tariff, which controlled this shipment and which was admitted in evidence by the trial court, specifically stated that the duty to unload rested upon the shipper.

Throughout the trial, the trial judge expressed concern over the question of when the railroad lost control of the shipment and who was responsible for losses occurring due to the failure of the consignee to properly and completely unload. At the conclusion of the trial, the trial judge stated he wanted to know just when the responsibility of the railroad ended.

Milwaukee contends that this is indeed the crucial question in this case and appeals from the trial court ruling that the railroad's responsibility for the grain and liability for its loss continued beyond the time the grain was delivered to the siding of the consignee.

Two issues are presented on appeal:

1. Whether the trial court erred in applying state rather than federal law.

2. Whether the trial court erred in holding Milwaukee liable for the loss of grain where the evidence clearly showed the railroad cars were not defective, and that the loss occurred after the grain was in the possession of the consignee.

Counsel for both parties admitted in their respective trial briefs that the controlling law was 49 U.S.C. § 20(11). However, the trial court, in its findings and conclusions of law referred to section 8-812, R.C.M. 1947, as controlling. Specifically, in finding of fact VII and conclusion of law III, the court stated that the railroad was not entitled to relief from liability under the exceptions provided in section 8-812.

- 5 -

The shipment of malting barley originated in Montana and terminated in Duluth, Minnesota. That such a shipment was in interstate commerce is so obvious as to not require discussion or elaboration. Suffice it to say that the shipment involved crossed several state lines and involved persons and businesses of several different states.

The Constitution of the United States has reserved and granted to Congress the power to regulate commerce among the several states. Art. I, Section 8, United States Constitution. While there is authority to the effect that states may legislate on certain matters affecting interstate commerce, unless and until Congress legislates, there is no question that once Congress regulates interstate commerce by enacting a statute, it preempts the field and supersedes all state legislation affecting the same subject. In referring specifically to 49 U.S.C. § 20(11), known as the Carmack Amendment, in Adams Express Co. v. Croninger, 226 U.S. 491, 33 S.Ct. 148, 57 L.ed. 314, 320, the United States Supreme Court said:

> "That the legislation supersedes all the regulations and policies of a particular state upon the same subject results from its general character. It embraces the subject of the liability of the carrier under a bill of lading which he must issue, and limits his power to exempt himself by rule, regulation, or contract. Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject, and supersede all state regulation with reference to it. Only the silence of Congress authorized the exercise of the police power of the state upon the subject of such contracts. But when Congress acted in such a way as to manifest a purpose to exercise its conceded authority, the regulating power of the state ceased to exist."

See also: New York, New Haven & Hartford Railroad Co. v. Nothnagle, 346 U.S. 128, 131, 73 S.Ct. 986, 97 L.ed. 1500.

The liability of Milwaukee should have been determined with reference to the provisions of the Carmack Amendment and related case decisions, and not with regard to Montana law. At best, the Montana statute upon which the trial court relied could have only been controlling with respect to shipments purely intrastate in character. Where, as here, the shipment was in interstate commerce, the trial court erred in applying state rather than

federal law.

The wording of the Carmack Amendment is important in determining the liability of the common carrier, specifically, in this instance, the Milwaukee Railroad. 49 U.S.C. § 20(11), states, in part, that the carrier:

> " * * * shall be liable to the lawful holder of said receipt or bill of lading * * * <u>for the full actual loss, damage, or injury to such property caused by it</u>".
> (Emphasis added.)

The emphasized portions are important because they indicate that liability shall be placed upon the carrier only when it causes the loss. Here, the record is entirely devoid of any testimony which would indicate that any loss of grain occurred while the grain was in the possession of Milwaukee. To the contrary, the record indicated that each car upon which a claim was filed was inspected on arrival at Capital in Duluth, by a disinterested third party, namely, the Duluth Board of Trade, and no leaks of any nature were detected.

On the other hand, the record is replete with testimony, including that of Mr. Eisenman, president of Eisenman Seed Co., that the grain loss was occurring because that grain was being improperly and incompletely unloaded at Capital. The principal issue then becomes---who had the responsibility for unloading the grain?

By virtue of the inspection reports issued by the Duluth Board of Trade, it is apparent the shipments arrived in good order at the place designated by the bills of lading, the siding at Capital. While there are no Montana cases directly in point, there are numerous decisions from other jurisdictions holding that the carrier is absolved from responsibility for unloading bulk commodities in carload lots when the car or cars are delivered to the consignee.

In Republic Carloading & Distributing Co. v. Missouri Pacific R. Co., 302 F.2d 381, 386, the court said:

> "<u>Common carrier liability ceases upon delivery of the shipment to the consignee.</u> Delivery of a carload shipment, such as is involved in this category, is normally effected when the car is placed on a team track or spotted."
> (Emphasis supplied.)

In Jones v. Thompson, 360 Mo. 285, 228 S.W.2d 673, 676, the court said:

- 7 -

> "The general rule, at least as to dead freight, is that
> the carrier is primarily bound both to load and unload
> in a proper manner freight delivered to it for trans-
> portation. And for breach of that duty resulting in
> damage it will generally be liable. But by custom or
> usage an exception generally obtains in the case of bulky
> freight in carload lots. * * * Thereunder the carrier is
> not required to unload such freight from the car."
> (Emphasis added.)

Respondent Eisenman urges that Milwaukee has not carried its burden

of proof citing Joseph Toker Co. v. Lehigh Valley R. Co., 12 N.J. 608, 97

A.2d 598, 599. Here, the documentary evidence, uncontradicted, was that

the shipments arrived in good order. Thus, Milwaukee did carry its burden

of proof.

Clearly, on the basis of the shipments involved being bulk ship-

ments in carload lots, it is apparent the duty to unload was not that of the

railroad, but rather that of Capital. However, there is a second basis upon

which the burden to unload is placed upon the consignee. The cars were

placed upon a private siding at Capital. 13 C.J.S. Carriers § 67, p. 124,

states:

> "The general rule requiring the carrier to load and unload
> shipments is also not applicable to a case where the cars
> are not to be loaded or unloaded at the station or on the
> lands and tracks of the carrier. Where cars are delivered
> on a private siding off the land of the carrier, it is
> under no obligation to unload them." (Emphasis added.)

In Secretary of Agriculture v. United States, 347 U.S. 645, 74 S.Ct.

826, 98 L.ed 1015, 1020, the Court said:

> "In the case of private sidings, the railroad's job
> ends when it has placed the car on the consignee's
> siding." (Emphasis added.)

Milwaukee had neither the equipment nor the facilities at Duluth to

unload grain. The cars were spotted at Capital's siding for the consignee

to handle from then on. The railroad's duty ended there. Thereafter, the

employees or agents of Capital unloaded the grain and, in so doing, left

a considerable amount of grain in the cars. According to the testimony of

Mr. Eisenman, not all of his grain was unloaded and he suffered a loss as

a result. That loss was directly and proximately caused by the actions

and derelictions of Capital, and not by any act or omission on the part of Milwaukee.

The evidence presented did not support the trial court's finding that the loss of grain was caused by Milwaukee.

Therefore, the judgment of the district court is reversed and this cause is remanded with instructions to enter judgment in favor of defendant.

_Wesley Castles_
Associate Justice

We concur:

_James T. Harrison_
Chief Justice

_Frank I. Haswell_

_Gene B. Daly_
Associate Justices

Mr. Justice John Conway Harrison dissenting:

I dissent.

_John Conway Harrison_
Associate Justice