The MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY, a corporation, Plaintiff,

v.

PUBLIC SERVICE COMMISSION of Utah et al., Defendants,

v.

Ernest H. DEAN, on Behalf of himself as an individual and other citizens in number more than 25, Counter-Plaintiff.

No. 13412.

Supreme Court of Utah.

May 13, 1975.

David E. Salisbury and Dwight B. Williams, Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, for Mountain States Tel. & Tel. Co.

Glen J. Ellis, Maxfield, Gammon, Ellis & Dalebout, Provo, for Dean, and others.

Vernon B. Romney, Atty. Gen., G. Blaine Davis, Asst. Atty. Gen., Salt Lake City, for defendants.

ELLETT, Justice:

This petition involves a review of a Report and Order entered by the Public Service Commission of Utah, hereinafter referred to as Commission, on May 15, 1973, requiring The Mountain States Telephone and Telegraph Company, hereinafter referred to as Mountain Bell, to provide extended area telephone service within certain areas of Utah County. The matter was heard by the Commission pursuant to a petition filed by Mountain Bell seeking approval to provide an optional calling service previously initiated in other parts of the state known as Metropolitan Preferred Area Calling, hereinafter called METROPAC. This service would offer to customers within Utah County the optional right to subscribe to the METROPAC arrangement pursuant to which they could call other customers within exchanges having their rate center within an 18-mile radius of the rate center in which the calling customer resides.

A counter-petition was filed by Ernest H. Dean, a state senator, on behalf of himself and other citizens of Utah County

seeking toll-free county-wide extended area service within Utah County.

The Commission, in its Report and Order, ordered Mountain Bell to install the necessary facilities to provide additional Extended Area Service in three areas of Utah County as follows: (a) Between the exchanges in cities in the north half of the county, to wit: Lehi, American Fork, Pleasant Grove, and Provo; (b) between the exchanges in cities in the south half of the county, to wit: Provo, Spanish Fork, and Payson; and (c) between the exchanges of Goshen in the extreme south part of the county and Payson and Spanish Fork.

The Order further provided that the customers in all of the various exchanges in Utah County, other than Springville and Goshen, would then fall into Rate Group 7 for purposes of determining their basic telephone rates.

Mountain Bell is duly certificated to provide telephone service in all areas of Utah County with the exception of the town of Thistle. For many years, telephone service has been provided throughout Utah County with the county divided into eight exchanges which substantially coincide with the incorporated areas of the eight principal cities within the county. Prior to the initiation of the present case, arrangements existed which permitted customers in each of the exchanges, other than Pleasant Grove and Goshen, to call customers located in the immediately contiguous exchanges without toll charges. This right to call toll-free from one exchange into another is sometimes referred to as Extended Area Service, or EAS. Under the system of tariffs utilized by Mountain Bell and approved by the Commission, exchanges are grouped for rate purposes into various rate groups based upon the number of customers. A subscriber can call within his own exchange area and to adjacent exchanges under EAS.

On February 7, 1972, Mountain Bell filed a petition with the Commission seeking approval of two proposals. The first proposal involved a request to provide EAS between Pleasant Grove and the Orem zone of the Provo exchange, which proposal was granted, and the service requested has been implemented. The second proposal was to provide METROPAC service to the exchanges in Utah County situated within 18 miles of the rate center in Provo. Under this arrangement, a resident customer would pay, in addition to the regular base rate, a monthly rate of $6.00 per month for a 180-minute allowance or a $4.00 charge for a 120-minute monthly allowance, with additional time above the initial allowance to be billed at the reduced rate of five cents per minute. This would mean that a customer having this service could call into other exchanges within an 18-mile radius toll-free for the total number of minutes per month purchased at a substantially reduced rate with additional minutes to be billed at a rate less than a regular toll charge. This would be an *optional* service for those customers desiring same.

Two separate counter-petitions were filed by Ernest H. Dean on behalf of himself and other citizens of Utah County opposing the proposed METROPAC service and requesting the Commission to require Mountain Bell to provide Extended Area Service throughout all of Utah County.

A hearing was held, commencing December 5, 1972, on the proposal of Mountain Bell to provide METROPAC service and on the issues raised by the counter-petitions. Senator Dean presented testimony from a number of Mountain Bell customers in Utah County, who testified that they would like county-wide Extended Area Service and would be willing to have a small increase in their telephone charges to receive this service. He himself testified at length with reference to a comparison of Utah County to Davis and Weber Counties to the north and also to the Salt Lake metropolitan area in an attempt to show that Utah County had been discriminated against in the kind of telephone service provided in that county.

The Commission issued its Report and Order on May 15, 1973, ordering Mountain Bell to install the necessary plant and facilities to provide EAS (1) between the exchanges of Lehi, American Fork, Pleasant Grove, and Provo; (2) between the exchanges of Provo, Spanish Fork, and Payson; and (3) between the exchanges of Goshen, Payson, and Spanish Fork. The only rate adjustment provided for Mountain Bell under the Order was the fact that customers in each exchange would be changed to Rate Group 7 with the exception of the exchanges of Springville, which would remain in Rate Group 6, and Goshen, which would be changed to Rate Group 4.

On June 4, 1973, Mountain Bell filed a Petition for Rehearing, which petition was denied by an Order of the Commission dated July 13, 1973. It is from the Order of the Commission dated May 15, 1973, and the denial of its Petition for Rehearing that Mountain Bell has appealed to this court.

■ Mountain Bell claims that the order made is unlawful, arbitrary, and capricious, since it did not follow orders made in other counties having similar problems. It also claims that the Commission was subjected to undue influence by Mr. Dean, who is and was a member of the State Senate. It is claimed that when the members of the Commission were before the Senate Judiciary Committee on matters not related to the instant matter, Senator Dean lectured them regarding this matter, which was then pending, and that he urged them to enter the order which was finally made.

The answer to the latter claim seems to lie in the fact that the Commission did not enter the order requested by Senator Dean in the counter-petition which he and many other citizens of Utah County had urged. It may be that the tactics of the senator were unwise and improper. However, the likelihood of improper influence is small, since there are 28 other senators, none of whom tried to influence the commissioners.

■ Complaint is also made because at a hearing before the Commission of this matter Senator Dean, a party thereto, was permitted to ask questions and make a statement not under oath. The statute[1] provides:

All hearings, investigations and proceedings shall be governed by this chapter and by rules of practice and procedure to be adopted by the public utilities commission; in the conduct thereof the technical rules of evidence need not be applied. No informality in any hearing, investigation or proceeding, or in the manner of taking testimony, shall invalidate any order, decision, rule or regulation made, approved or confirmed by the commission.

It would thus appear that there was no reversible impropriety about that matter.

■ In a prior proceeding involving another county, the commission had said:

\*    \*    \*    \*    \*    \*

8. It is obvious from the testimony and study in this matter that the solution to the situation which exists in North Davis County and other suburban areas of the state is not to simply continue to provide Extended Area Service outward from the metropolitan exchanges. Serious consideration must henceforth be given to the concept of usage-sensitive service in which the subscriber, within certain limitations, is charged for telephone service on the basis of the frequency, length and distance of the calls which he makes.

9. In considering future cases, this Commission will give serious consideration to the concept that EAS should, generally, be provided only between contiguous exchanges and that calling to more distant exchanges should be provided by some form of usage-sensitive service.

1. Section 54–7–1, U.C.A.1953.

Thus, broad generalizations of the policy which should be *seriously* considered was set out insofar as it related to *suburban areas* of the state.

There is no reason to think that the Commission did not seriously consider the "usage-sensitive service" concept before making its ruling in the instant matter. However, even if the Commission did not fully consider the concept, it is not fatal to the ruling made in this case. The general law is stated in 73 C.J.S. Public Administrative Bodies and Procedure § 148 as follows:

> The doctrine of stare decisis, discussed generally in Courts §§ 186–216, is not generally applicable to the decisions of administrative tribunals; nor does a prior administrative determination ordinarily preclude a subsequent one on the grounds of equitable estoppel. Accordingly, administrative bodies are not ordinarily bound by their prior determinations or the principles or policies on which they are based. . . .

█ Mountain Bell offered testimony to the effect that the cost of giving the service as ordered would necessitate an investment of some $4,749,300.00. Another expert witness estimated the cost to be $1,212,000.00. The Commission was not required to accept the higher figure of plaintiff's witness, and its proceedings and findings are presumed to be correct[2] unless they are capricious or arbitrary or are not supported by testimony.

█ One of the largest steel mills in the country is located in Utah County, and there are many smaller plants nearby to make use of its products. The area is thus fast becoming a manufacturing and commercial region. Men from all over the county work side by side in the various plants, and it appears that the continuance of eight separate and distinct phone exchanges is not in the public interest, and this is especially so where charges are being collected for a long-distance call, even though the two phones are in close proximity to each other, if in different exchange areas.

We do not think we should substitute our judgment for that of the Commission in matters such as this where the evidence before the Commission justifies the order made and where it does not appear to be either arbitrary or capricious.

The order made by the Commission is sustained. No costs are awarded.

CROCKETT, TUCKETT and MAUGHAN, JJ., concur.

HENRIOD, Chief Justice (dissenting):

This is a review of a Public Service Commission order requiring the Phone Company to provide "extended area telephone service" (EAS) in certain Utah County geographical areas. The order should be set aside,[1]—the one of two alternatives we have under the statute, although the other participating Justices have indicated a disposition to affirm the decision of the Public Service Commission. So, their action represents the law of this case. One Justice agreed with what follows, but at the time of this authorship, is not on the Court.

This case originally was assigned to this author, who wrote what follows and distributed it on December 10, 1974, but the matter has been pending until March 27, 1975, when the last member of the Court responded. Hence, this opinion simply is interpretive of my conclusion and thoughts about this case.

EAS had been operative in the Salt Lake County Metropolitan area for some time by permission and order of the Commission and more recently such service had been inaugurated in the so-called North Davis County area, immediately adjacent to that North of Salt Lake County.

---

2. Garrett Freightlines, Inc. v. Hunt, 19 Utah 2d 234, 499 P.2d 981 (1967).

1. One of the two alternatives we have under Title 54–7–16, Utah Code Annotated 1953.

The area subject of this review has to do with the Utah County area, immediately adjacent to the South of Salt Lake County. There was evidence that the EAS had mushroomed to the point that serious questions had arisen with respect to installation costs, maintenance, quantitative and qualitative service to the consumers.

Such problems seem to have surfaced in a case involving the Davis County area,[2] dated December 28, 1971, that either dampened the holiday spirits of some, or provided a euphoria to others, depending on who, why, where or whatever was concerned in this current drama. That case came up, among other things, with the following conclusion:

It is obvious from the testimony and study in this matter that the solution to the situation which exists in North Davis County and other suburban areas of the state is not to simply continue to provide Extended Area Service outward from the metropolitan exchanges. *Serious consideration must henceforth be given to the concept of usage-sensitive service in which the subscriber, within certain limitations, is charged for telephone service on the basis of the frequency, length, and distance of the calls which he makes.*

*In considering future cases, this Commission will give serious consideration to the concept that EAS should, generally, be provided only between contiguous exchanges and that calling to more distant exchanges should be provided by some form of usage-sensitive service.*

Almost everyone most surely would interpret that language that, in a court of law, would be viewed as a sort of "stare decisis" situation,—certainly something of a green light or an impelling invitation to one contemplating the filing of a petition with respect to almost free toll charges. Adjunctive to such a conclusion or implied

interdiction is the corollary concept that if an administrative agency is confronted with, hears and reviews a subsequent petition touching the same subject matter, necessarily, in all fairness and equity, it should state with utmost clarity and specificity, its reasons in departing from such clearly announced policy.[3] Nothing in the Commission's order can be found that mentions or even suggests such reason, but on the contrary disarmingly ignores such a rule of its own making. Poignantly it is expressed in A. T. & S. F. Ry. v. Wichita, supra, in the following language:

There is then, at least a presumption that those policies will be carried out best if the settled rule is adhered to. From this presumption flows the agency's duty to explain its departure from prior norms. Secretary of Agriculture v. United States, 347 U.S. [645], at 653, 74 S.Ct. [826], at 831 [98 L.Ed. 1015] (1954). The agency may flatly repudiate those norms, deciding, for example, that changed circumstances mean that they are no longer required in order to effectuate congressional policy. Or it may narrow the zone in which some rule will be applied, because it appears that a more discriminating invocation of the rule will best serve congressional policy. Or it may find that, although the rule in general serves useful purposes, peculiarities of the case before it suggest that the rule not be applied in that case. *Whatever the ground for the departure from prior norms, however, it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate.*

It is submitted that the procedure and decision of the Commission here based on a petition filed only six weeks after Case No. 6242, and involving the same problem in a small geographical area, in which a

2. Mtn.St.Tel. & Tel., Case 6242, having to do with "Consideration of a revised tariff for Metropolitan Preferred Area Calling (METROPAC) service."

3. A.T. & S.F.Ry. v. Wichita, 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973); N. L. R. B. v. Wyman, 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969).

Metropac (an optional, usage-sensitive arrangement) package was proposed in such restricted area, in and of itself hardly could be said to be an action where the Commission "regularly pursued its authority" under the letter and spirit of Title 54–7–16, Utah Code Annotated 1953. Particularly is this significant and true where the petitioner here in its petition relied on the language of the Commission in 6242, expressly stating that:

Consistent with the philosophy reviewed by the Commission in its Order dated December 28, 1971, in Case No. 6242, your Petitioner proposes to establish extended area service between the Pleasant Grove Exchange and the Orem Zone of the Provo Metropolitan Exchange. This service will provide toll free calling between customers of your Petitioner residing within these two areas.

The quotation above presented the only issue involved. Nonetheless, the Commission entertained a counter petition filed by State Senator Dean, mentioned in the main opinion, who also was a state employee, in which he asked for county-wide Extended Area Service for free. The Commission granted neither the petitioner's proposal nor that of Mr. Dean, citizen, and/or Senator Dean representing his constituency,—but arrived at an almost obvious compromise that was a cosmic league afar from the petitioner's sole-issue prayer engendered by P.S.C. Case No. 6242, supra, and that of Dean's county-wide freeloader quest.

The petition for county-wide toll-free service filed by Dean was supported by several thousand signatures of Utah County residents, subscribing to the following undated statement, which was not notarized or authenticated but addressed to and delivered by Dean to the Public Service Commission.

We, the undersigned residents of Utah County, support Senator Ernest H. Dean and the other 100 Utah County residents in their petition to make all of Utah County a toll-free telephone exchange at a basic rate not to exceed that presently imposed upon the Weber County subscriber, which we understand is $5.70 for a one-party residence phone.

The signatures were obtained largely from shoppers, in supermarkets throughout Utah County, by agents employed by and assisting Dean. The statement obviously was more or less meaningless from a probative standpoint because of its lack of specificity and quite an obvious eye-catcher, since it was an endorsement of something that was to be gained almost for free, and had no worthwhile information upon which anyone could give an accurate, sober, considered opinion, although the Commission assigned the signatures as one factor in its decision. Some of such signators who appeared as witnesses, on cross-examination indicated that they did not know much about that to which they had subscribed. All of these signators and many other residents and business men in Utah County towns, contributed little or no substantial facts pertinent to the issues except the fact that they would like to have a comparatively lot more service for almost no personal cost.

Besides all the above, and even though he must be complimented for his zeal and boundless efforts in pursuing the interests of his constituency, this author thinks that Dean's energies could be said to have been better employed than in the personal, persuasive and pointed manner that may suggest to a spectator that partiality possibly could or might inject itself in a ball game whose umpire was hired by the home team. One cannot simply blink at the fact that as an elected member of the Senate, a body that not only has a hand in giving birth to the Commission, but becomes its benefactor and obligee of the individual members by controlling in considerable measure, their tenure, by approving their appointment, regulating and assigning their duties, holding the purse strings incident to their employment and the like, such a legislator may have considerable influence, which,

though unwittingly and honestly exercised, may be misplaced, and that such member may not realize that with such beholdenment it might be suggested by a venturesome one to be so personal as possibly and effectively to convince one or more members to arrive at a conclusion somewhat different than would have been made otherwise.

Along this line, the original hearing was continued at the Senator's request and was conducted in Provo instead of the State Capitol, to accommodate him and other residents of the County. Unusual evening meetings were arranged; thereafter, the Senator was sworn and testified as a witness under oath. He had an attorney who ostensibly represented him, although the Senator was permitted to make an opening statement while not under oath, and at times allowed to ask questions of witnesses, irrespective of the fact he had counsel. He was accorded copies of testimony and exhibits a day before the petitioner. After the hearing was over, and before the commissioners arrived at a decision, and while the legislature was in session, he appeared before the Senate Judiciary Committee as an invitee (as stated in the minutes) of someone unknown, since he was not one of the 32 shown on the Judicial Committee's "Guest List," (as shown in the minutes). The meeting of the Judiciary Committee was called to discuss specifically with the members of the Public Service Commission a statutory problem not germane to this case. The Senator was introduced and asked to speak, which he did, by discussing and explaining, not the matter at hand, but the controversy in Utah County between the telephone company and its customers, with respect to the company's treatment of the areas relating to toll calls, concluding by addressing the commissioners and stating he felt they should feel free to come to the legislature when it runs into trouble.

Each individual circumstance in the record, in and of itself, may or may not have justified a conclusion that the Commission had not "regularly pursued its authority" interdicted by the statute, but all of the circumstances, viewed in the aggregate, certainly demonstrate that the unorthodoxy of procedure here was weighted against equality of presentation as to render fallible any "regularly-pursued-its-authority" urgence, and to render lukewarm the jestful "infallibility of the Commission" rule. This is said without downgrading the integrity of the Commission, the Senator or anyone else, but only with a downgrading of the *method* of arriving at a conclusion, —which is statutory,—and also not the bona fides of anyone,—simply a possible conflict of interest problem which, no matter how conscientious the scenario, has little or no place in an open, adversary administrative proceeding. (All emphasis added.)