SOUTHERN MOTOR CARRIERS RATE CONFERENCE INC. and Central & Southern Motor Freight Tariff Ass'n, Inc., Intervening-Plaintiffs,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants.

DRUG AND TOILET PREPARATION TRAFFIC CONFERENCE et al., Plaintiffs,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants,

and

Middle Atlantic Conference et al., Intervening-Defendants.

Civ. A. Nos. 74–1133, 75–0131.

United States District Court, District of Columbia, Civil Division.

July 19, 1976.

**1188**

Robert E. Born, Atlanta, Ga., admitted pro hac vice, for intervening-plaintiff Southern Motor Carriers Rate Conference, Inc.

Norman R. Powell, Louisville, Ky., admitted pro hac vice, for intervening-defendant Central and Southern Motor Freight Tariff Association.

Walter H. Walker, III, Washington, D.C., for ICC and United States.

Jacob P. Billig, Washington, D.C., for plaintiffs Drug & Toilet Preparation Traffic Conference, Eastern Industrial Traffic League, and National Small Shipments Traffic Conference, Inc.

John M. Cleary, Washington, D.C., for plaintiffs Grocery Manufacturers of America, Inc., and National Industrial Traffic League.

Ronald K. Kolins, Washington, D.C., for plaintiff National Association of Food Chains.

Bryce Rea, Jr., Washington, D.C., for intervening-defendants Middle Atlantic Conference; New England Motor Rate Bureau, Inc.; Eastern Central Motor Carriers Association; Central States Motor Freight Bureau, Inc.

Before LEVENTHAL, Circuit Judge, and GASCH and ROBINSON, District Judges.

LEVENTHAL, Circuit Judge:

This is one of the last gasps of three-judge district court review over orders of the Interstate Commerce Commission (ICC or Commission).[1] It presents a consolidated suit to set aside the ICC report and order in Docket No. 34661 (Sub-No. 26), et al., *Segregation of Freight, New England and Middle Atlantic States,* 340 I.C.C. 306, decided November 24, 1971 (1971 Order). By that report and order, the Commission defined the obligation of motor common carriers of general commodities to perform "normal pickup and delivery service" as encompassing "any and all loading and unloading functions," including the sorting and segregating of freight.[2]

Civil Action No. 74-1133, filed on July 29, 1974, was initiated by carrier groups troubled by the Commission's definition of "normal pickup and delivery service." Most of the carrier plaintiffs dropped out of the case after the filing of the Government's brief, which offered an interpretation of the 1971 Order satisfying their concerns. However, two carrier groups remain as intervening plaintiffs,[3] and their contention, injected into Civil Action No. 74-1133, will be discussed in part III. While the interpretation in the Government's brief satisfied most of the carrier plaintiffs, it precipitated Civil Action No. 75-0131, filed on January 29, 1975, a challenge by shipper and con-

---

1. 28 U.S.C. §§ 1336(a), 2321-25. Under the amendments enacted January 2, 1975, Pub.L. 93-584, §§ 1, 5-7, 88 Stat. 1917, actions to enjoin or suspend ICC orders are now brought in the courts of appeals, with single-judge district courts retaining jurisdiction to enjoin or suspend ICC orders for the payment of money or collection of fines, etc. However, section 10 of the 1975 amendments provides that the new procedures do not apply to actions commenced on or before the last day of the first month beginning after the date of enactment (January 2, 1975), and to actions pending when the amendments became effective. Civil Action No. 74-1133 was filed on July 29, 1974, and Civil Action No. 75-0131 commenced on January 28, 1975.

2. We recognize that the Commission itself has found treacherous any definition of the practice of sorting and segregating of freight, see 340 I.C.C. at 320, but for the benefit of the reader we suggest that it is a method of loading or unloading freight in which items are separated according to brand, flavor, size or any other means of identification.

3. On February 13, 1976, the court dismissed the action as to plaintiff motor carriers Middle Atlantic Conference, Central States Motor Freight Bureau, Eastern Central Motor Carriers Ass'n, Inc., and the New England Motor Rate Bureau, but it allowed intervening plaintiffs Southern Motor Carriers Rate Conference, Inc. and Central & Southern Motor Freight Tariff Ass'n, Inc. to continue prosecution of the suit.

signee groups,[4] which will be discussed in part II. By an order dated October 15, 1975, issued in explanation of a denial of a petition for clarification, the ICC formalized the interpretation in dispute here.

Defendants are the ICC and the United States of America, as statutory defendant under 28 U.S.C. § 2322. The carrier groups, both those formerly plaintiffs in No. 74–1133 and those continuing the prosecution of that suit, have intervened as defendants in the shipper-initiated action.

On January 8, 1976, the court ordered that the proceedings in the two actions be consolidated. Briefing schedule was set on February 13, 1976. Argument on the merits was heard on May 21, 1976.

## I. BACKGROUND AND PRIOR PROCEEDINGS

From the inception of motor carrier regulation, pickup and delivery service has been regarded as one of the normal functions of a motor carrier.[5] The regulatory problem for the Commission, however, has been to define which services are included within the concept of normal pickup and delivery service. Although carrier practices have been far from uniform, a clear differentiation has emerged between motor carriers of general commodities, who generally hold themselves out to perform loading and unloading services, and motor carriers of specialized commodities, many of whom do not perform loading and unloading functions.[6] However, among general commodity carriers who profess to load and unload, some perform services in regard to sorting and segregating of freight, because they find such practice helpful as a means of verifying the contents of shipments delivered, while others do not.

The prevalence of differing sorting and segregating practices among motor carriers, and the uncertainty concerning the extent of a carrier's duty to render such services, have lead the Commission into varying positions. The Commission's view in the early days of motor carrier regulation was that sorting and segregating was a service not normally associated with motor freight transportation, and that provision for such service, and charges therefor, must be specifically stated in the carrier's tariff.[7] In 1965 the ICC conducted an investigation to determine if certain interstate motor common carriers of general commodities had been performing sorting and segregating services, under the line-haul rates without separate charge, in a manner so as to discriminate among shippers and consignees in violation of sections 217(b) and 222(c) of the Interstate Commerce Act (Act), 49 U.S.C. §§ 317(b), 322(c). In *Associated Wholesale Grocers, Inc., et al.—Investigation of Practices*, 325 I.C.C. 631, 649, aff'd, 272 F.Supp. 274 (D.Kan.1967), the Commission held (1) that concessions and privileges had been solicited, granted, extended and received in the form of "extra services" in violation of sections 217(b) and 222(c); and (2) "[t]hat a tariff must contain specific authority for extra services and the charges therefor, unless it clearly indicates that the line-haul rates in the tariff include the services."

In order to effect compliance with the decision in *Associated,* the carriers published and filed various rules under which they held themselves out to perform the sorting and segregating of freight under various terms, conditions and charges. With some

---

4. Plaintiffs in No. 75–0131 are Drug & Toilet Preparation Traffic Conference, Eastern Industrial Traffic League, Inc., Grocery Manufacturers of America, Inc., National Ass'n of Food Chains, Inc., National Industrial Traffic League, and National Small Shipments Traffic Conference, Inc.

5. Rules and Rates, O. K. Transfer & Storage Co., S. Territory, 18 M.C.C. 699, 702 (1939).

6. *See, e. g.,* Oilfield Equipment to and Between the Southwest, 300 I.C.C. 409, 425 (1957). The responsibility of meat haulers to unload loose and carcass meat is presently in litigation. Unloading Restrictions on Meats & Packinghouse Products, 349 I.C.C. 189 (1975), *vacated and remanded for further proceedings, National Ass'n of Food Chains, Inc., et al. v. ICC, et al.,* 175 U.S.App.D.C. ——, 535 F.2d 1308 (1976).

7. Fee Transfer, Minimum Charge Per Trip, 46 M.C.C. 705, 708–09 (1947).

variations, the proposed rules provided that carriers would perform sorting and segregating services under the line-haul rates, without additional charge, only where the shipments were presorted by the shipper. This mode of delivery would amount to unloading the merchandise in a sequence reverse to that of the tender, a process known as "reverse sequential unloading." [8]

The ICC instituted twenty-four formal investigations of the various rules under section 216(g) of the Act, 49 U.S.C. § 316(g).[9] These were consolidated in part,[10] and three separate hearings [11] were held before three different hearing examiners (now administrative law judges). Applying the rationale of the *Associated* case, the examiners rendered initial decisions finding that the carriers had not borne their burden of proving that the rules were just, reasonable and otherwise lawful, and ordering the rules cancelled. The Commission's Division 2 affirmed. 335 I.C.C. 239 (1969). It found the proposed tariff rules were unclear and ambiguous, or otherwise permitted uncertainty and discrimination in their

---

**8.** The proposed rules were essentially of three types. (1) The Middle Atlantic rule provided that the rates in the tariff did not include the sorting and segregating of freight, except where shipments of 10,000 pounds or more were presorted "according to marks, brands, sizes, flavors or other distinguishing characteristics," and so stated on the bill of lading, and the consignee "requires the delivery so stated," in which case the carrier would deliver the lading "in the same segregated order without additional charge." As to shipments not falling within this exception, there was a schedule of charges. (2) The New England and Middlewest rules were somewhat similar, except that the "no-charge" provision applied only to truckload shipments under the New England rule and to shipments weighing 1,500 pounds or more under the Middlewest rule. (3) The GMA (Grocery Manufacturers of America) rule simply provided that when shipments are tendered in a sorted and segregated manner and so identified on the shipping documents, delivery service includes tendering to the consignee in the same manner. It made no distinction between truckload and less-than-truckload shipments and made no provision for sorting and segregating under circumstances not included within the rule. 335 I.C.C. at 242–43.

**9.** 49 U.S.C. § 316(g) provides:

**New rates; determination of fairness by Commission; suspension**

(g) Whenever there shall be filed with the Commission any schedule stating a new individual or joint rate, fare, charge, or classification for the transportation of passengers or property by a common carrier or carriers by motor vehicle, or by any such carrier or carriers in conjunction with a common carrier or carriers by railroad and/or express, and/or water in interstate or foreign commerce, or any rule, regulation, or practice affecting such rate, fare, or charge, or the value of the service thereunder, the Commission is authorized and empowered upon complaint of any interested party or upon its own initiative at once and, if it so orders, without answer or other formal pleading by the interested carrier or carriers, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, fare, or charge, or such rule, regulation, or practice, and pending such hearing and the decision thereon the Commission, by filing with such schedule and delivering to the carrier or carriers affected thereby a statement in writing of its reasons for such suspension, may from time to time suspend the operation of such schedule and defer the use of such rate, fare, or charge, or such rule, regulation, or practice, but not for a longer period than seven months beyond the time when it would otherwise go into effect; and after hearing, whether completed before or after the rate, fare, charge, classification, rule, regulation, or practice goes into effect, the Commission may make such order with reference thereto as would be proper in a proceeding instituted after it had become effective. If the proceeding has not been concluded and an order made within the period of suspension, the proposed change of rate, fare, or charge, or classification, rule, regulation, or practice, shall go into effect at the end of such period: *Provided,* That this subsection shall not apply to any initial schedule or schedules filed on or before July 31, 1938, by any such carrier in bona fide operation on October 1, 1935. At any hearing involving a change in a rate, fare, charge, or classification, or in a rule, regulation, or practice, the burden of proof shall be upon the carrier to show that the proposed changed rate, fare, charge, classification, rule, regulation, or practice is just and reasonable.

**10.** In some of the proceedings the parties stipulated that they would be bound by the Commission's decision in Docket No. 34661.

**11.** The investigations were conducted by "modified procedure," a method for handling cases through the use of written affidavits, with oral hearing held only if necessary for cross examination. ICC General Rules of Practice, Rules 45–54, 247, 49 C.F.R. §§ 1100.45–54, 1100.247.

application, and that the proponents failed to present sufficient evidence to enable the Division to determine whether the proposed rules were cost-justified.[12]

Having designated the matter as one involving an issue of general transportation importance, the Commission allowed the submission of further pleadings. On November 24, 1971, the Commission, *en banc*, three Commissioners concurring in part, issued the report and order under challenge here. 340 I.C.C. 306. It affirmed the Division's disapproval of the proposed rules, but on different grounds. It found that because of the increasing prevalence of carrier sorting and segregating of freight in accordance with "reverse sequential unloading," and the fact that such services had been taken into account by many shippers and carriers in negotiating commodity rates, there existed a "real economic need" for the performance of such services as an incident to normal delivery service. In response to this economic need, and in order to eliminate the potential for discriminatory practices uncovered in the *Associated* proceeding, the Commission determined that "a change in the existing regulatory posture concerning motor carrier pickup and delivery practices," *id.* at 323, was needed. Its new regulatory posture was to permit the rendition of sorting and segregating services under the line-haul rates without further tariff authorization or specific charge. The Commission thus rejected the approach of the *Associated* case, which characterized

sorting and segregating as an "extra service" requiring specific notice and charges in tariffs.

The Commission embodied its new policy within what it termed a "new" definition of "normal pickup and delivery service," one fashioned with such breadth as to disregard the restrictions of existing carrier practices and the proposed rules.[13]

We conclude that normal pickup and delivery service encompasses any and all loading and unloading functions, including the performance of all types of related extra services without regard to the nature or type of freight involved or to which particular carrier handles same in line-haul movement, which one carrier employee (usually the driver) can perform in accordance with directions from the consignor or consignee, as the case may be, during the allotted free [loading or unloading] time.[14]

\*   \*   \*   \*   \*   \*

The preceding definition of what constitutes normal pickup and delivery service governs those situations in which the carriers are obligated by a tariff-imposed duty to load and unload. In such situations we conclude that, except where otherwise provided in a tariff, shippers and receivers of freight in truckload lots shall have free use of a carrier employee during the published free-time period, and that the applicable line-haul rates properly should include compensation for such

---

**12.** Division 2 disapproved the proposed rules without prejudice to the publication of a suggested sorting rule appearing in appendix C of its report. 335 I.C.C. at 247, 251–52.

**13.** The Commission found that the proposed rules were either "too indefinite" or otherwise "inappropriate for consistent application" among a carrier's shippers or consignees, because "the involved tariff descriptions of reverse sequence loading and unloading, or for that matter any conceivable definition thereof, could be readily construed by the carriers or drivers as permitting either more or less service than that authorized under their tariff obligation to check the count of articles to assure a complete delivery in sound condition of all items tendered." 340 I.C.C. at 320. The Com-

mission opted for an all-inclusive definition, on the reasoning that "any tariff description of reverse sequence unloading could readily be used as a subterfuge by carriers to permit discriminate treatment in the quantum of sorting and segregating service rendered different receivers in order to verify the contents of the shipment delivered." *Id.* at 320–21.

**14.** Under the detention rule prescribed by the ICC in Detention of Motor Vehicles—Middle Atlantic and New England, 325 I.C.C. 336 (1965), "allotted free time" refers to the time necessary to perform a normal loading or unloading service. If a motor vehicle is detained beyond that time through no fault of the carrier, the shipper or consignee must pay detention charges.

use as described in the preceding definition.

340 I.C.C. at 321–22.[15]

The carriers filed several petitions for reconsideration of the 1971 Order, premised on the assumption that the new definition mandated the performance of sorting and segregating services. These petitions were denied by an order dated August 10, 1972. However, at the carriers' request, the Commission by an order dated March 14, 1973 postponed the effective date of its decision to June 30, 1974, in order to permit the carriers to publish on an experimental basis a rule satisfactory to both carriers and shippers, and such a rule is now in effect in the carriers' tariffs.[16] On May 20, 1974, the carriers filed a petition seeking the "rescission and vacation" of the 1971 Order on the ground that the experimental rule met the carriers' and shippers' needs. On June 10, the shippers replied to the petition by opposing rescission and vacation while urging the Commission to find that a substitute

rule similar to that advocated by carriers constituted compliance with the 1971 Order. On June 27, the Commission issued an order denying the petition.[17]

On July 29, 1974, the carriers filed Civil Action No. 74–1133 to set aside the Commission's new definition of "normal pickup and delivery service." On July 30, the court granted a temporary restraining order, which had not been opposed by the Commission. The opportunity for continuance of the experimental rule, provided by the stay, has been extended by administrative acquiescence.

The gravamen of the carriers' attack in No. 74–1133 was that their tariffs provided for one loading and unloading, defined therein as the movement of freight from or to a position immediately adjacent to the truck, and that the new definition would require them to do anything with the freight that a shipper or consignee wanted done. The 1971 Order, the carriers charged, would require them to perform without

**15.** This definition applies only to truckload lot shipments. As to less-than-truckload or any-quantity shipments, the Commission established a somewhat different rule which permits the performance of sorting and segregating services under the line-haul rate only if the carriers "opt in" by filing new tariff rules. If, on the other hand, a carrier does not wish to perform such service or wishes to do so only for an extra charge it must expressly provide for such in its tariffs. 340 I.C.C. at 324–25.

**16.** As currently published in Item 20, ¶ (E)(1)(a), MF–ICC A–2510, Middle Atlantic Conference, Agent, the experimental rule provides:

When a shipment is tendered to the carrier in lots according to size, brand, flavor, or other characteristics and is so identified on the Bill of Lading or accompanying papers, normal delivery service includes delivery of the shipment to the consignee in the same manner, including the placement of such segregated lots on the platform, dock, conveyor, pallet, dolly, buggy or similar device provided by the consignee for the receipt of freight within or adjacent to the vehicle without additional charge to the extent such service is performed within the free time period allowed by the applicable detention provisions. If delivery is not completed within the allowable free time, carrier will continue to unload the vehicle subject to applicable detention

charges specified in items published elsewhere in this tariff.

Certified Record as Submitted by Defendants (hereinafter "C.R.") at 535.

**17.** The Commission's reasons for denying the petition were:

That the petition offers no substantive justification for rescission and vacation of the said report and order; that rescission and vacation and adoption of the substitute rule advocated by petitioners would nullify the objectives sought to be attained by the Commission in respect to the performance of sorting and segregating services on a lawful and nondiscriminatory basis; and that the substitute rules respectively advocated by petitioners and replicants wholly disregard the pronouncements and guidelines set forth in the said report of the Commission; that the rule proposed by the joint replicants was previously rejected by the Commission in the said report and order, and that, petitioner's substitute rule . . . is indefinite and inadequate as it does not, among other things, make provision for the differences in service to be accorded truckload and less-than-truckload shipments, provide for extra labor charges in addition to a detention provision, or provide an adequate solution to the problems the said report and order attempted to ameliorate . . . .

C.R. 539.

charge during the "allotted free time" services that they had theretofore performed only at a charge, as well as services that they had not previously performed at all. In their joint brief, defendants responded that the carriers had misinterpreted the thrust of the 1971 Order. Defendants stated that only sorting and segregating were embraced within the new definition of "normal pickup and delivery service," and that the purpose of the new definition was to permit the provision of such services without additional tariff authority, although carriers not wishing to perform such "may very clearly avoid doing so by providing otherwise in their tariffs." [18]

The carriers thereupon petitioned the Commission to clarify its decision and this court stayed further proceedings in No. 74–1133 pending action on the petition. On October 23, 1975, the Commission issued an order denying the petition, but at the same time stating that the new definition, although not limited to the sorting and segregating of freight, "covers transportation related duties only and does not embrace non-transportation service such as sweeping warehouse docks"; and that carriers may by tariff provision define and limit the sorting and segregating they will perform. However, the Commission admonished, "any such tariff will be subject to possible investigation and suspension by the Commission pursuant to section 216(g) of the act," with "the burden of proving tariff schedules effecting any reduction in service just and reasonable rest[ing] with the carrier. (*Inspection in Transit, Grain and Grain Products*, 349 I.C.C. 89)." Satisfied with this, the carriers moved to dismiss their suit, although two carrier groups remain as intervening plaintiffs because they feel that the Commission presently interprets the 1971 Order to reach "transportation related" services other than sorting and segregating, but without permitting carriers to "opt out" by tariff provision.

Shortly before the filing of the carriers' petition for clarification, shipper and consignee groups filed Civil Action No. 75–0131, attacking the Commission's decision as interpreted in its brief in No. 74–1133. The gravamen of the latter attack is that consistent with the 1971 Order and the carriers' statutory duties the carriers cannot be permitted to publish tariff rules which provide that they will not sort and segregate freight in the course of loading or unloading it.

## II. CIVIL ACTION NO. 75–0131

Plaintiff shippers and consignees level what is essentially a twofold attack on the 1971 Order as interpreted by the Commission. First, they argue that the Commission's present "opting out" interpretation is arbitrary and capricious because it is contrary to the language, findings and thrust of the 1971 Order, and even if not fatally inconsistent, it is void for lack of findings, for lack of reasoned decisionmaking. Second, plaintiffs maintain that if the present interpretation is allowed to stand as congruent with the 1971 Order, and based on rational findings contained therein, then the Commission's decision is unlawful because it relieves carriers of their statutory obligation under section 216(b) of the Act, 49 U.S.C. § 316(b),[19] to provide "safe and adequate service" and contravenes "national transportation policy" in failing to preserve the inherent advantages of motor truck carriage.

### A. *Statutory Duty*

We turn to plaintiff's statutory claim first. Whether plaintiffs hinge the carrier's obligation to sort and segregate on the concept of common carrier duty or base it on

---

**18.** Joint Br. of the United States of America & ICC, Civil Action No. 74–1133, at 3, 29–30, 33.

**19.** 49 U.S.C. § 316(b) provides in pertinent part:

It shall be the duty of every common carrier of property by motor vehicle to provide safe and adequate service . . . .; to establish, observe and enforce just and reasonable rates . . . regulations and practices relating thereto and to the manner and method of . . . delivering property for transportation, the facilities for transportation, and all other matters relating to or connected with the transportation of property . . . . .

commercial need and trade practice,[20] this contention was neither raised before the Commission in the proceedings leading up to the 1971 decision and the subsequent petitions for reconsideration nor in any sense considered by the agency in its report and order. The 1971 Order did not turn on any notion of statutory obligation. The Commission had no occasion to reach the issue, as all the carriers filing tariff rules in these proceedings were obligated by their tariffs to load and unload. And the "new" definition of "normal pickup and delivery service" is premised on the existence of a *tariff*-imposed duty to load and unload, coming into play only when the carriers are so obligated. There is simply no indication in the Commission's report that it was dealing with anything other than the definition of tariff terms. The Commission's stated purpose was to "determin[e] the extent of the transportation service which can lawfully be performed by the carriers under the line-haul rates," 340 I.C.C. at 319, and thus by a change in "regulatory posture" prevent the discriminatory practices uncovered in the *Associated* case. It is against this overriding objective that the Commission's discussion of the efficiency of carrier sorting and segregating and the "real economic need" of shippers and consignees for the continued performance of such services must be read.[21]

■ Hence plaintiffs' statutory challenge is simply not properly before us. Plaintiffs

had no reason to raise this issue in the proceedings before the ICC because they were satisfied with the 1971 Order until recent events made clear that "opting out" might be permitted under some circumstances. Shipper and receiver groups thereupon developed the point, for the first time, in replies to the carriers' 1975 petition for clarification. But the Commission did not respond to this line of argument in its October 23, 1975 order denying clarification. Plaintiffs are not foreclosed from raising their statutory arguments in a subsequent section 216(g) proceeding addressed to a particular "opting out" provision. The Commission has stated elsewhere that the question of whether carrier performance of a particular function "is an essential part of the transportation service must depend upon a case-by-case analysis of the terms of a carrier's outstanding authority in light of the statutory obligation to provide a complete service, the characteristics of the commodities transported, and the commercial needs and practices of the industry or shippers served."[22] On the record developed in such an inquiry the outcome may indeed be along the lines desired by plaintiffs,[23] to require carriers to provide in their tariffs for a complete service, including sorting and segregating, with the publication of rates for that service in segments or as a two-tier structure (one set of rates for a complete service and a set of lower rates for a lesser service).[24] However, on the

---

**20.** The Commission has recently fashioned a test for defining a carrier's statutory obligation to provide a complete service based essentially on commercial need and industry practice. *See* Unloading Restrictions on Meats & Packinghouse Products, 346 I.C.C. 775, 792 (1974), *on reconsideration*, 349 I.C.C. 189, 190 (1975), *vacated and remanded for further proceedings, National Ass'n of Food Chains, Inc. et al. v. ICC, et al.*, 175 U.S.App.D.C. ——, 535 F.2d 1308 (1976).

**21.** These factors were identified as justifying not an enlargement of statutory duty but rather a change in the status of sorting and segregating from an accessorial service, which had to be separately stated and charged, to an incident of "normal delivery service" presumed of all carriers under a tariff requirement to load and unload. *See* 340 I.C.C. at 319.

**22.** *See* note 20 *supra*.

**23.** Br. of Plaintiffs Drug & Toilet Preparation Traffic Conf., et al., at 28 n. 49; Joint Br. of Plaintiffs The National Industrial Traffic League, et al., at 10–11, 13.

**24.** A motor carrier has a certain degree of rate-making flexibility but this does not extend to tariff publication of absolute service restrictions in abrogation of the full scope of its authorized service and statutory obligations. *See* Restrictions on Service by Motor Carriers, 111 M.C.C. 151, 170–71 (1970), *aff'd*, 119 M.C.C. 691 (1974); Unloading Restrictions on Meats & Packinghouse Products, supra note 20, 346 I.C.C. at 794–95.

basis of the present record, developed, as it was, with a focus on problems of discrimination and tariff definition, and in the absence of a determination by the Commission in the first instance, it would violate the doctrine of primary jurisdiction and correlative principles of agency-court partnership to initiate a judicial definition of the scope of a motor carrier's statutory obligations to the shipping and receiving public.

## B. *Tariff Duty*

The Commission's "opting out" interpretation, as stated in the October 23, 1975 order denying the carriers' petition for clarification, is "[t]hat a carrier may in its discretion file tariffs which limit its obligation to perform sorting and segregating services," subject to a possible investigation and suspension proceeding under section 216(g) with the burden on the carrier to prove the reasonableness of any reduction in service. This is all the Commission's actions have revealed about the extent to which carriers can "opt out" of sorting and segregating services, and this statement delimits the scope of judicial review at this juncture.[25] We do not know under what circumstances the Commission will permit "opting out," what tariff language it will require in compliance with the 1971 Order, or what the consequences of "opting out" will be on rates and rate structure. These are matters for another day.

The sole issue properly before us is whether the "new" definition of "normal pickup and delivery service" requires that motor carriers of general commodities, to the extent they remain under a tariff-imposed duty to load and unload, be prohibited from "opting out" *under any circumstances* from their presumed obligation to sort and segregate during the "allotted free time" at

line-haul rates. Shipper plaintiffs state in their complaint (p. 5) that because the 1971 Order integrated sorting and segregating with loading and unloading as part of the same basic service, the Commission cannot permit an "opting out" of sorting and segregating "without abrogating its own definition of pickup and delivery service. . . . ." The Government counters that the 1971 Order merely effected a definitional shift, for purpose of tariff publication requirements, to recognize sorting and segregating as a normal part of tariff-prescribed unloading service on truckload shipments, and expressly contemplated an "opting out" procedure through the filing of a tariff schedule change, which would be subject to possible section 216 scrutiny with the burden on the carrier to justify the reduction in service.

The Commission's "opting out" interpretation does not stand independently of the 1971 Order. It issued only as a clarification of what is contained in the 1971 Order. Plaintiffs do not assert that the evidence of record would not support an "opting out" interpretation. As they frame their challenge, the court's task is to determine whether this reading of the 1971 Order is rationally based, given the intermediate findings and conclusions of the report and order, and undergirded by adequate findings.

In our view, provision for "opting out" was clearly within the contemplation of the Commission in promulgating the 1971 Order. It is evident from the report and order, considered as a whole, that the Commission did not intend to freeze sorting and segregating service as an immutable obligation of motor carriers who profess to load and unload. The critical paragraph is that quoted above, where the Commission, in

---

**25.** The briefs of counsel for the Government offer a more extensive statement, suggesting carriers have absolute discretion as to whether or not to "opt out" of sorting and segregation, although the precise consequences for rates and rate structure remain undefined. *See* Joint Br. of United States & Interstate Commerce Comm'n, Civil Action No. 75–0131, at 24–25, 34; Civil Action No. 74–1133, at 3–4, 29–30, 33; Defendants' Further Argument, Civil Action

No. 74–1133, at 19–21. However, the court cannot consider the agency's decision on grounds supplied by appellate counsel but not relied upon by the agency itself. *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1947); *Burlington Truck Lines v. United States*, 371 U.S. 156, 168–69 (1962). Similarly, we cannot assume that the ICC will approve the interpretation of its October 1975 order proffered by its counsel to the court.

setting out the conditions precedent to application of its "new" definition, states "except where otherwise provided in a tariff" shippers and consignees will have free use during the "allotted free time" of a carrier employee to perform the services described in the preceding definition. This passage plainly makes provision for "opting out" of free sorting and segregating service.[26]

There are other indicia in the 1971 Order that the Commission was not promulgating an inflexible rule, that it sought to recognize changing industry practice and eliminate the potential for discriminatory conferral of service but without "plac[ing] an undue or unreasonable burden upon the carriers or unjustly encroach[ing] upon their managerial discretion." 340 I.C.C. at 319. The Commission believed that most carriers would file tariffs conforming to its "new" definition, but the evidence of record was such that the agency surely contemplated that some carriers would seek to "opt out" of sorting and segregating. In describing the testimony before the hearing examiners, the Commission referred to "the conflicting evidence offered by the opposing parties [as] reflect[ing] a wide variety of practices and a great difference of opinion as to the lawfulness, desirability, and cost of sorting, with or without a presorted tender by the shipper." Id. at 310. A good number of carriers testified that they did not sort or segregate freight because they found the practice time-consuming, costly, and generally disruptive of their overall operations.[27] This recognition of the variance of carrier sorting and segregating

practices continues on into the "discussion and conclusions" section of the 1971 report. There the Commission indicated that while "reverse sequential unloading" had become "a common practice among the carriers generally" it was nonetheless a practice that "varied extensively as between individual carriers," id. at 319; and that although some carriers found sorting and segregating to be "the most practical and economical method of verifying the count of articles delivered and . . . rendered delivery services accordingly," there were "[o]ther carriers [who] believed otherwise and have performed a lesser delivery service," id. at 320.

The Commission was operating within a particular economic and statutory framework, and although the agency did not expressly advert to these matters our construction of the reach of the 1971 Order cannot ignore the necessary play of these contextual factors. The Commission's "new" definition of "normal pickup and delivery service" was consciously promulgated without regard to cost factors. Division 2 had disapproved the proposed rules because of an inadequate showing on cost justification. The full Commission conceded this evidentiary insufficiency, 340 I.C.C. at 318–19, but stated that it did not believe the proposed rules "may be properly rejected for failing to meet minimum cost standards, the applications of which would not be appropriate in the situation presented here," id. at 320.

■ The Commission felt that the increasing incidence and overall desirability

---

**26.** Plaintiff Drug & Toilet Preparation Traffic Conference suggests that by this language the Commission meant to permit "opting out" of the "allotted free time" provision only. Reply Br. 4–6. In the Commission's reasoning the "new" definition was expressly premised on the "free time" concept, as not imposing unreasonable burdens on the carriers, because under the existing tariffs "the shipper at its own discretion may hold the vehicle pending loading or unloading during the allotted free time without penalty." 340 I.C.C. at 322. If, as plaintiffs contend, the Commission recognized an overriding common carrier duty to unload, including therein a duty to sort and segregate, it would seem that the carrier would have an

obligation to provide the time necessary for this function, see Detention of Motor Vehicles, 325 I.C.C. 336 (1965). So the interpretation proposed by plaintiff raises more questions than it answers. We think the more natural reading, and the one we accept, is that the reference contemplated the possibility of modifying the tariff-imposed duty by "opting out" of sorting and segregating.

**27.** This testimony is summarized in the Government's brief in Civil Action 75–0131, at 28–31. Although, as plaintiffs charge, this testimony was not extensively discussed by the Commission, it was not ignored.

of carrier performance of sorting and segregating justified inclusion of the service within the basic line-haul rate; "in these special circumstances other ratemaking concepts" took "preced[ence] over conventional costing principles," 340 I.C.C. at 319. However, it would mark a truly radical step in ratemaking policy, rather than a mere change in "regulatory posture," for the Commission, without the slightest consideration of cost standards, to have required all carriers, irrespective of particular circumstances, to provide sorting and segregating services. Although the Commission provided that the line-haul rate might have to be adjusted to reflect the rendition of services in accord with its "new" definition, *id.* at 322, it was aware of the testimony of several carriers and carrier groups who found sorting and segregating a disruptive and undesirable practice even at compensatory rates. Apparently all the carriers whose tariffs were before the agency performed some modicum of sorting and segregating services, generally limited to shipments tendered in a presorted fashion, but the existence of a number of carriers who never performed any variant of the service in question and testified they would not render this service even at compensatory rates strongly suggests that the Commission did not contemplate an across-the-board rule for all carriers.

Furthermore, we cannot assume that the Commission intended by its "new" definition to bar motor carrier access to the procedure ordinarily available for any duty imposed by tariff. The Commission's interpretation, as it presently stands, merely makes explicit the availability of section 216(g) procedures. The filing of any new tariff schedule is governed by section 216(g), with the burden on the carriers in such a proceeding to prove that tariff

schedules effecting a reduction in services are just and reasonable.[28] The 1975 ruling explaining the denial of the carriers' petition for clarification cites to *Inspection in Transit, Grain and Grain Products,* 349 I.C.C. 89 (1975). That was a case where rail carriers sought to remove in-transit grain inspection service from the line-haul rate and make it the subject of a separate charge. On remand from the Supreme Court's decision in *Atchison, T. &. S.F. R. Co. v. Wichita Board of Trade,* 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973), the Commission placed the burden on the carriers to prove the reduction in line-haul rate service was just and reasonable.

Plaintiffs charge that the agency's course is wholly without rationality. They point to external indications of a "reversal" *sub silentio* of the 1971 Order, in the Commission's refusal to grant reconsideration between 1971 and 1972 at the behest of carrier petitioners who read the 1971 Order to impose new mandatory obligations; and in the refusal to accept the 1974 proffer by shippers and carriers of an experimental rule as being in substantial compliance with the 1971 decision. The reluctance of this particular agency to grant prompt clarification of its often poorly crafted reports is frequently encountered, and indeed a recurring lament of reviewing courts. In all fairness, however, courts often deny petitions for clarification, even though they do not disagree with petitioner's position, either because they think the opinion and order reasonably clear, or because any ambiguity must await further focus than counsel's perfectionist anxiety to avoid all possible shadow of doubt. In this case the Commission's total course avoided prejudice to the parties, as their consensual arrangement for sorting and segregating has remained in effect.[29] And although the ways

---

**28.** *See Secretary of Agriculture v. United States,* 347 U.S. 645, 654, 74 S.Ct. 826, 98 L.Ed. 1015 (1954); *Atchison, T. & S.F. R. Co. v. Wichita Board of Trade,* 412 U.S. 800, 815–16, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973), involving rail carrier charges for services which had been previously performed under the line-haul rates subject to ICC scrutiny pursuant to section 15(7) of the Act, 49 U.S.C. § 15(7), the provi-

sion for rail carriers analogous to section 216(g). Section 15(7) has been amended by § 202(e) of the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. 94–210, 90 Stat. 31, 36.

**29.** *Compare Southern Railway Co., et al. v. USA & ICC,* 412 F.Supp. 1122 (D.D.C.1976).

of the ICC are often inscrutable, it may have had good reason for acting as it did.[30] It would be an extreme and unsound rule of administrative law to set aside an otherwise valid agency order, when there is no need to take action to mitigate resulting unfairness, merely because the agency fails to allay the anxieties of those it regulates by promptly providing desired clarification.

We do not agree with plaintiffs that the mere provision of an "opting out" procedure nullifies the thrust of the 1971 Order. As to the issue properly before us—that is, whether the availability of such a procedure was contemplated by the 1971 decision and flows rationally from the findings therein—we find that the Commission has merely reordered its tariff publication requirements in light of the generality of shipper-carrier practice, with a consequent shift in the burden of proof onto those carriers seeking to except themselves from the general rule. As matters presently stand, this interpretation is fully congruent with the overriding objective of the 1971 Order to prevent the abuses uncovered in the *Associated* case by (a) providing an all-inclusive definition of sorting and segregation service; (b) reducing the proliferation of segmented carrier rate structure; and (c) eliminating the opportunity for carrier discrimination by picking and choosing among shippers and consignees.

We hold only that the Commission's interpretation on its face flows rationally from the language and findings of the 1971 Order. There may be situations where "opting out" is unassailably in accord with the considerations prompting the 1971 decision—say, where a carrier which has never provided any variant of the contested service in the past seeks to formalize its practice *in futuro* by tariff provision. Plaintiffs envision circumstances where "opting out" would undermine the Commission's all-inclusive definition of sorting and segregat-

ing and sanction the proliferation of segmented carrier rate structures. At the present juncture, however, plaintiffs are raising an across-the-board attack on the 1971 Order as interpreted, and this we reject. We cannot set aside the agency's decision because of speculation as to the circumstances under which the Commission will permit "opting out," or the consequences that will obtain for rates and rate structure. Plaintiff's attack as to these matters is premature.

As a final note, we advert to a matter broached at oral argument, even though not central to our present task, to avoid any possible misunderstanding. We refer to the issue of the viability of the rule that has been in effect by common consent during the pendency of this litigation. Carriers and shippers alike have indicated they would be satisfied with a state of affairs limiting the carrier's obligation to sort and segregate to shipments that are presorted by the shipper, *i. e.*, "reverse sequential unloading." The parties petitioned the Commission in 1974 to endorse their experimental rule, in which carriers partially "opted out" by agreeing to sort and segregate without additional charge only when shipments are presorted. In oral argument before this court, the parties reiterated their satisfaction with the experimental rule, and gave the court the distinct impression that the instant dispute would come to an end if the Commission were to extend its approval. Counsel for the ICC, when pressed by the court, indicated their understanding that carriers could state in "opt out" provisions that they would sort and segregate presorted shipments only, because this was their past practice and was accordingly reflected in their line-haul rates (Tr. of May 21, 1976 Hearing, at 95).

Although the Commission may have had good reason for denying the 1974 petitions, we do not understand it to have passed on

---

**30.** The June 27, 1974 rejection of the substitute experimental rule may have been due to the wording of the carriers' petition as one for "rescission and vacation" of the 1971 Order; the fact that the substitute rule was cast as a redefinition of "normal pickup and delivery" rather than as an "opting out" provision; and the rule's failure to "make provision for the differences in service to be accorded truckload and less-than-truckload shipments." *See* note 17 *supra*.

the validity *vel non* of the approach underlying the experimental rule.[31] None of the parties have specifically challenged the Commission's denial of the 1974 petitions, and indeed there was no incentive to do so with the turn of events permitting the experimental rule to remain in effect. It would therefore be open to the parties to resubmit the experimental rule recast in light of the problems identified in the order denying the 1974 petitions. While the experimental rule in its reliance on the "reverse sequential unloading" concept is similar to the rules that were before the ICC in 1971, there are differences in form, and these might be deemed significant, particularly if the present formulation is modified in response to the Commission's stated concerns. More important, perhaps the Commission now has the ability to appraise the problem—the vices and virtues of "reverse sequential unloading"—in the light of actual experience with the experimental rule. The position of Government counsel at argument, while of course not binding, does signify a recognition of the virtues in the practice. As to vices, experience in the industry since 1971 may indicate that the Commission's fear of substantial carrier discrimination did not materialize in practice,

and may lead the Commission to entertain some partial "opt out" provisions framed in terms of "reverse sequence unloading." Flexibility in the light of experience is a hallmark of the administrative process. *American Airlines, Inc. v. CAB*, 123 U.S. App.D.C. 310, 319, 359 F.2d 624, 633 (en banc), *cert. denied*, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966).

## III.  CIVIL ACTION NO. 74–1133

Two carrier groups remain in this action as intervening plaintiffs. They were not respondents in the proceedings before the Commission because they have never provided sorting or segregating services to their shippers and consignees and indeed specifically excluded the provision of such services from their tariffs.[32]

Intervening plaintiffs are troubled by the breadth of the 1971 redefinition of "normal pickup and delivery service" as "encompass[ing] any and all loading and unloading functions, including the performance of all types of related services," 340 I.C.C. at 321. They fear that the Commission now views the 1971 decision as imposing unknown obligations on carriers in addition to sorting and segregating but without providing a similar "opting out" procedure.[33] This interpretation, they ar-

---

31. For the Commission's stated reasons, see notes 17 & 30 *supra*. The explanation that counsel for the ICC proffered at oral argument was that the experimental rule did not address the difference in treatment to be accorded truckload and less-than-truckload shipments. The 1971 Order requires on less-than-truckload shipments that a carrier must make specific tariff provision as to its sorting and segregating practice. *See* note 15 *supra*.

32. Southern Motor Carriers Rate Conference, Inc. was a protestant appearing in opposition to the proposed rules because they failed to provide charges for sorting and segregating services, at least in the case of presorted shipments. See Initial Br., Civil Action No. 74–1133, at 4–5.

Central & Southern Motor Freight Traffic Ass'n, Inc. did not intervene in the proceeding before the agency until March 1, 1972, after the Division 2 decision had issued and the Commission had reopened the proceeding as a matter of general transportation importance (C.R. 389). Apparently none of the tariffs of its members or their competitors were before the Commission, with the exception of Sub-No. 11,

*Sorting and Segregation of Shipments, Various States*, a case which was discontinued because the carrier involved cancelled its proposed tariff rule. *See* Initial Br., Civil Action No. 74–1133, at 3, 5.

33. In explaining its October 23, 1975 denial of the carriers' petition for clarification of the 1971 Order, the Commission stated that "normal pickup and delivery service" "refers to loading and unloading related services generally, including but not limited to the sorting and segregating of freight. . . ."

Counsel for the Government submit that the "opting out" provision contemplated in the 1971 Order is not restricted to sorting and segregating practices but is available for all "related services," and that the October 23, 1975 "clarification" did not deal with "opting out" of "related services" other than sorting and segregating because the Commission "was simply responding to a specific point raised in the petition." *See* Defendants' Further Argument, Civil Action No. 74–1133, at 19–21 & n. 6.

Plaintiff Southern Motor Carrier Conference, Inc. states that its interests would be satisfied

gue, (1) is void for vagueness; and (2) is, in effect, a general rule promulgated for the entire motor carrier industry without notice to, and opportunity for participation by, all possibly affected parties, since only sorting and segregating rules were before the Commission.

As we construe the 1971 report and order, the Commission's "new" definition of "normal pickup and delivery service" embraces only sorting and segregating practices.[34] The Commission adopted an all-inclusive definition, framed in terms of "all types of related services," because it feared that definitional specification of the practice would lead to carrier subterfuge and continued discrimination among shippers and consignees. However, there is simply no indication in the 1971 Order that the Commission was concerned with practices other than sorting and segregating which are "related" to loading and unloading. At oral argument the court requested counsel for the Govern-

ment to identify the basis in the record and the 1971 Order for their present interpretation. Defendants' extensive submission, styled "Further Argument," does not cite to any language in the 1971 decision or to any testimony before the hearing examiners indicating that the Commission's inquiry extended beyond sorting and segregating practices.[35] The Commission's November 10, 1965 notice of a broad inquiry into "all matters and issues with respect to the lawfulness of said rates, charges, rules, regulations and practices under the Interstate Commerce Act" (C.R. 1) cannot by itself support a reading without basis in the language or findings of the 1971 Order. This general language is boiler plate for ICC investigation orders, and requires some additional indicia to be a meaningful expansion of the prior specifics. The Government's brief in Civil Action No. 74–1133 states that the 1971 decision reached only sorting and segregating. This is not controlling, of course, but we think Govern-

if the court "adopts" the construction of Government counsel to permit carriers "to avoid the newly imposed obligations simply by publishing a rule in their tariffs that no 'extra related services' will be provided." Reply to Joint Motion of Defendants to Submit Further Argument, Civil Action No. 74–1133, at 2–4. However, this apparently would not satisfy plaintiff Central & Southern Motor Freight Tariff Ass'n., Inc. In any event, we are not in a position to "adopt" this "opting out" construction, because we do not read the 1971 Order to reach "related services" other than those encompassed within the sorting and segregating function. *See* pp. 1200–1201 *infra.*

34. Even when pressed at oral argument, counsel for the Government were hard put to specify what "related services" other than sorting and segregating were supposedly contemplated by the Commission. The Government's post-argument submission states: "the extra related services which a carrier will be called upon to perform basically consist of either sorting and segregating in whatever form the carrier wishes to engage, or such practices as counting and stowing, which were evidenced in the *Tennessee-Carolina Transp., Inc.—Investigation* (337 I.C.C. 542) case as being a customary part of loading and unloading service." Defendants' Further Argument, *supra* note 33, at 20. We do not find any determination in the cited decision that stowing and counting is "a customary part of the loading and unloading service" of motor carriers generally, other than the

negative finding that the use of more than one man in performing those functions is not an essential part of loading and unloading and must be separately stated in the tariff, *see* 337 I.C.C. at 551. In any event, the reach of the *Tennessee-Carolina* decision is outside of the scope of this action.

35. Government counsel's three or four isolated references to the record illustrate the elusiveness that bedevils any attempt at defining, or even speaking about, sorting and segregating practices (*see* note 2 *supra*), but clearly it is the function of sorting and segregating that is being discussed (*see* Tr. of Apr. 4, 1966 Hearing, at 18, 22). Examiner Dahan's suggestion (Tr. 21–30) that a rule be promulgated which would simply create time limits for a "maximum ordinary delivery" at the line-haul rates, without specifically denominating the services rendered "sorting and segregating," simply anticipated the approach of the Commission in the 1971 Order; it does not support a reading of the 1971 decision embracing services which extend beyond the sorting and segregating function. In any event, as recognized by Government counsel, the parties could not agree on the Dahan proposal, and the hearing continued with "[o]ne party after another present[ing] evidence intended to establish that its normal pickup and delivery service did or did not include the performance of sorting and segregating." Defendants' Further Argument, *supra* note 33, at 11.

ment counsel had it right the first time around.

We recognize that the "clarification" of October 23, 1975 says that the Commission's 1971 redefinition of "normal pickup and delivery service" "refers to loading and unloading services generally, including but not limited to the sorting and segregating of freight. . . ." We read the Commission to be restating, albeit inartfully, the point made in the 1971 Order that it is the function of sorting and segregating that is at issue, and that the Commission was speaking broadly to avoid the possibility that carriers or shippers might call the rose by some other name and open the door to carrier discrimination.

We are not to be taken as commenting on what legal situation will prevail if in some case the Commission takes up carrier services other than sorting and segregating which it considers related to loading or unloading, whether it will or may rule either that such service cannot be rendered unless specifically described in the tariff, or on the contrary must be rendered (within the free time limits of the tariff) unless the carrier has opted out. All we say here is that the situation will not be governed by the terms of the order in issue.

Intervening plaintiffs in Civil Action No. 74-1133 are not entitled to a judgment adjudicating the Commission's 1971 Order as invalid. Instead, our opinion will stand as declaratory relief setting forth the proper interpretation of the 1971 Order.